[Crim. No. 8684.    In Bank.    Apr. 10, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. JOSEPH
BERNARD MORSE, Defendant and Appellant.

Joseph Bernard Morse, in pro. per., Frank L. Eddens, Jr., and Robert E. Rickles, under appointments by the Supreme Court, Heinly & Rickles and Heinly & Eddens for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Gordon Ringer, Deputy Attorney General, for Plaintiff and Respondent.

SULLIVAN, J.—A jury found defendant guilty of first degree murder (Pen. Code, §§ 187, 189)[1] and fixed the penalty at death (§ 190). The trial judge denied defendant's motions for a new trial and for reduction of penalty. This appeal is automatic. (§ 1239, subd. (b).)

On August 6, 1964, a jury determined that defendant, who in 1962 had been found guilty of murdering his mother and sister, should suffer life imprisonment. On August 14, 1964, while defendant was confined in the San Diego County jail awaiting formal sentencing for these crimes, he garrotted Thomas Larry Taddei, another prisoner, with part of a mattress cover braided into a cord.

---

[1] Hereafter, unless otherwise indicated, all section references are to the Penal Code.

Both defendant and Taddei occupied separate cells in a cellblock on the fifth floor of the jail. Deputy Sheriff Murkerson, who was assigned to jail duty on the floor below, was delivering medicine to another inmate in the same cellblock as defendant when he found the victim lying outside defendant's cell with his head and neck suspended by a sort of woven rope attached to the bars. Defendant was in his cell. Murkerson called to defendant ''Cut him loose, Joe.'' Defendant, standing in the center of the cell and looking at the jailer, shrugged his shoulders, lay down on the bunk behind him, and folded his hands behind his head. Murkerson went for help and returned shortly with two other officers and a trusty. One of the officers cut the cord which had been knotted at the back of the victim's neck and looped around and knotted behind a bar of defendant's cell. Murkerson noticed that the victim was pale and cold and that there was paper sticking out of his mouth. An attempt was made to revive Taddei. Finally it was determined that he was dead.

At the trial Murkerson testified on *voir dire* outside the jury's presence that approximately two or three minutes after he had returned with help and while he and another officer were attempting to use artificial respiration on Taddei, he had a conversation with defendant. At this time the two officers were outside defendant's cell and Murkerson was kneeling beside the victim and facing defendant's cell. The jailer looked up toward defendant, who was lying on his bunk, and asked, ''Joe, did you do this?'' Defendant nodded his head in the affirmative and said, ''Yeah.'' The jailer then immediately asked, ''Why?'' and defendant replied, ''The sonofabitch wouldn't pay his debts.'' The jailer then asked, ''What did he owe you?'' and defendant immediately answered, ''Cigarettes.'' No further questions were asked at that time. At no time did Murkerson inform defendant of his right to counsel or of his absolute right to remain silent. Nor did defendant at any time request counsel or show any unwillingness to respond to the jailer's questions.

Testifying further on *voir dire* as to his purpose in asking the above questions, Murkerson said, ''From my information, I was surprised to find something like this and was still kind of amazed over it all, and I was trying to find out what had happened just for my own benefit.'' He further stated that he was not attempting by his questions to elicit an incriminating statement from defendant and that the thought of advising defendant of his rights did not occur to him at the time.

At the conclusion of the testimony on *voir dire* the court ruled that the first two of the three questions and answers involved in the conversation should be admitted with the proper foundation as to voluntariness. The jailer then resumed his testimony in the presence of the jury and gave substantially the same account which had been elicited on *voir dire*, except that his testimony regarding the conversation was limited as indicated by the court.

Defendant offered evidence at the trial on the issue of guilt and at the trial on the issue of penalty but did not take the stand on his own behalf at any time. Upon the return of the verdict of guilty, he personally withdrew, with the court's approval, his plea of not guilty by reason of insanity.

We first consider defendant's contention that his above statements to Deputy Sheriff Murkerson were secured in violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution, that their admission in evidence was error under the rules announced in *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], and *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal. Rptr. 169, 398 P.2d 361], and that such error is reversible per se because the statements constituted a confession. (*People* v. *Schader* (1965) 62 Cal.2d 716, 728 et seq. [44 Cal.Rptr. 193, 401 P.2d 665].)

We agree that the statements constitute a confession by defendant since it is obvious that they are a "declaration of his intentional participation in a criminal act" (*People* v. *Ferdinand* (1924) 194 Cal. 555, 568-569 [229 P. 341]; *People* v. *Fitzgerald* (1961) 56 Cal.2d 855, 861 [17 Cal.Rptr. 129, 366 P.2d 481]) and amount to a complete and express acknowledgment of the crime charged (3 Wigmore on Evidence (3d ed. 1940) § 821; McCormick on Evidence, p. 234). In fact, the first question and answer, viewed in their context, constitute in themselves a confession whose directness and clarity would be difficult to improve upon. Thus it is clear that reversal is here required if the statements were obtained in violation of defendant's constitutional rights. In our determination of this question we apply the standards set forth in *Escobedo* and *Dorado* rather than those set forth in *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], since the instant case was tried prior to June 13, 1966, the date of the *Miranda* decision. (*People* v. *Rollins* (1967) 65 Cal.2d 681, 685-691 [56 Cal.Rptr. 293, 423 P.2d 221].)

Following the decision of the United States Supreme Court in *Escobedo,* we held in *Dorado* ''that defendant's confession could not properly be introduced into evidence because (1) the investigation was no longer a general inquiry into an unsolved crime but had begun to focus on a particular suspect, (2) the suspect was in custody, (3) the authorities had carried out a process of interrogations that lent itself to eliciting incriminating statements, (4) the authorities had not effectively informed defendant of his right to counsel or of his absolute right to remain silent, and no evidence establishes that he had waived these rights.'' (*People* v. *Dorado, supra* 62 Cal.2d 338, 353-354.) ▌ In subsequent decisions we have repeatedly pointed out that the accusatory stage, or that stage when the suspect is entitled to counsel, has been reached when the investigation has begun to focus on the suspect, the suspect is in custody and the police have undertaken a process of interrogations that lends itself to eliciting incriminating statements.[2] ▌ We have also made it clear on a number of occasions that any determination as to whether or not a process of interrogations was undertaken must rest upon an objective test according to which we ''analyze the total situation which envelops the questioning by considering such factors as the length of the interrogation, the place and time of the interrogation, the nature of the questions, the conduct of the police and all other relevant circumstances.'' (*People* v. *Stewart* (1965) 62 Cal.2d 571, 579 [43 Cal.Rptr. 201, 400 P.2d 97], affd. sub nom. *California* v. *Stewart* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].)[3]

---

[2]*People* v. *Stewart* (1965) 62 Cal.2d 571, 577 [43 Cal.Rptr. 201, 400 P.2d 97], aff. sub. nom. *California* v. *Stewart* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602]; *People* v. *Bilderbach* (1965) 62 Cal.2d 757, 761 [44 Cal.Rptr. 313, 401 P.2d 921]; *People* v. *Bostick* (1965) 62 Cal.2d 820, 834 [44 Cal.Rptr. 649, 402 P.2d 529]; *People* v. *Forbs* (1965) 62 Cal.2d 847, 850-851 [44 Cal.Rptr. 753, 402 P.2d 825]; *People* v. *Green* (1965) 63 Cal.2d 561, 563-564 [47 Cal.Rptr. 477, 407 P.2d 653]; *Ballard* v. *Superior Court* (1966) 64 Cal.2d 159, 169 [49 Cal.Rptr. 302, 410 P.2d 838, 18 A.L.R.3d 1416]; *People* v. *Garavito* (1967) 65 Cal.2d 761, 765-766 [56 Cal.Rptr. 289, 423 P.2d 217]; *People* v. *Davis* (1967) 66 Cal.2d 175, 179-180 [57 Cal.Rptr. 130, 424 P.2d 682]; *People* v. *Stout* (1967) 66 Cal.2d 184, 195 [57 Cal.Rptr. 152, 424 P.2d 704]; *People* v. *Kelley* (1967) 66 Cal.2d 232, 245 [57 Cal.Rptr. 363, 424 P.2d 947]; *People* v. *Lookado* (1967) 66 Cal.2d 307, 319 [57 Cal.Rptr. 608, 425 P.2d 208]; *People* v. *Arnold* (1967) 66 Cal.2d 438, 444 [58 Cal.Rptr. 115, 426 P.2d 515]; *People* v. *Powell* (1967) 67 Cal.2d 32, 49 [59 Cal.Rptr. 817, 429 P.2d 137].

[3]*People* v. *Sears* (1965) 62 Cal.2d 737, 742 [44 Cal.Rptr. 330, 401 P.2d 938]; *People* v. *Perez* (1965) 62 Cal.2d 769, 774 [44 Cal.Rptr. 326, 401 P.2d 934]; *People* v. *Bostick* (1965) 62 Cal.2d 820, 835 [44 Cal.Rptr. 649, 402 P.2d 529]; *People* v. *Jacobson* (1965) 63 Cal.2d 319, 328 [46

■ We have determined, after consideration of the instant case according to these factors and principles, that the accusatory stage of interrogation was not reached prior to or during the short conversation here at issue, and that therefore there was no requirement that defendant be advised of his constitutional rights. Though we intend no implication that the accusatory stage of interrogation cannot be reached in the absence of a team of skilled detectives engaged in a protracted process of questioning, neither is it to be assumed that any question put by any police officer to a person seriously suspected of crime must necessarily be prefaced by information or warnings as to constitutional rights. As we said in *People* v. *Cotter* (1965) 63 Cal.2d 386 [46 Cal.Rptr. 622, 405 P.2d 862], vacated on another ground in *Cotter* v. *California* (1967) 386 U.S. 274 [18 L.Ed.2d 43, 87 S.Ct. 1035], our decisions dealing with the right to counsel before trial ''were aimed at restraining law enforcement officers, once the accusatory stage has been reached, from the use of inquisitorial techniques in seeking to prove the charge against the accused out of his own mouth.'' (63 Cal.2d at p. 393.)

In the case before us, the conversational episode took place in a time period of perhaps a few seconds and in a setting devoid of ''inquisitorial techniques.'' Murkerson, although a uniformed deputy sheriff, was in fact a jailer whose duties at the time were custodial, not investigative. He was not specifically assigned to defendant or to defendant's cell block, having been on duty on the floor below and having volunteered to bring medicine to another prisoner on the fifth floor. We note that here, while defendant was in custody in the general sense in which all prisoners are deemed to be in custody, he was not yet in custody for the particular offense. The general atmosphere of the setting discloses a preoccupation on the officers' part with reviving the victim rather than with interrogating a suspect. Murkerson and his companion were kneeling by Taddei's body outside defendant's locked cell; defendant was

Cal.Rptr. 515, 405 P.2d 555]; *People* v. *Stockman* (1965) 63 Cal.2d 494, 497-498 [47 Cal.Rptr. 365, 407 P.2d 277]; *People* v. *Marbury* (1965) 63 Cal.2d 574, 577-578 [47 Cal.Rptr. 491, 407 P.2d 667]; *People* v. *Chaney* (1965) 63 Cal.2d 767, 771 [48 Cal.Rptr. 188, 408 P.2d 964]; *People* v. *Buchanan* (1966) 63 Cal.2d 880, 885 [46 Cal.Rptr. 733, 409 P.2d 957]; *People* v. *Treloar* (1966) 64 Cal.2d 141, 146 [49 Cal.Rptr. 100, 410 P.2d 620]; *People* v. *Perez* (1967) 65 Cal.2d 709, 716 [56 Cal.Rptr. 312, 423 P.2d 240]; *People* v. *Stout* (1967) 66 Cal.2d 184, 197 [57 Cal.Rptr. 152, 424 P.2d 704]; *People* v. *Powell* (1967) 67 Cal.2d 32, 51 [59 Cal.Rptr. 817, 129 P.2d 137]; *People* v. *Haston* (1968) 69 Cal.2d 233, 252 [70 Cal.Rptr. 419, 444 P.2d 91].

not in face-to-face conversation with them but lying on his bunk. The questions were put to him by Murkerson while the latter was desperately attempting to resuscitate the victim and were couched in a context of stupefied wonderment, not of incisive inquiry. The answers were offered immediately—one gets the impression almost laconically—without any pressure from the questioner. We cannot detect in such an exchange any of the marks of an accusatory process. We are satisfied that no process of interrogation had been undertaken.

Defendant next contends that error occurred during the cross-examination of Dr. David Wilson, chief witness for the defense. Dr. Wilson, a psychiatrist, was appointed by the court upon motion and nomination of the defendant.[4] He testified on direct examination that defendant suffered from a sociopathic personality disorder; that this disorder combined with defendant's background and environment rendered his response to the victim's actions instinctual and automatic; that defendant was incapable of deliberations prior to his act; that the act was psychologically predictable; and that defendant was incapable of thinking or acting within the normal framework of morality.

On cross-examination, when confronted with a 15-page transcript of an interview between defendant and police officers on the night of the killing, Dr. Wilson admitted that he had considered defendant's statement therein in the formation of his expressed opinion and "found nothing there that would change my opinion." Earlier in the trial, when the prosecution had attempted to introduce this statement as part of its case-in-chief, it had been declared inadmissible on the ground that it had been obtained in violation of defendant's rights under the Sixth and Fourteenth Amendments.[5] Objection to the use of the statement in cross-examination was made on this basis. The court ruled that the contemplated line of cross-examination should proceed, but that the jury should

[4]On September 11, 1964, Dr. Elmer Haynes and Dr. Gloria A. Taylor were appointed by the court pursuant to the provisions of section 1027. On October 9, 1964, Dr. Wilson was appointed on defendant's motion "not . . . as an alienist under the provisions of 1027, but separate and in behalf of the defendant, and to assist counsel in preparation of the defense of this case."

[5]*Dorado* was first decided by this court on August 31, 1964. Dr. Wilson examined defendant on October 15, 1964, and also on October 29, 1964, after the trial commenced. The trial took place in October and November 1964 and prior to our final decision in *Dorado* (decided January 29, 1965). The record discloses that the learned trial judge excluded the statement during the People's case-in-chief on the basis of the rules announced in *Escobedo*.

be admonished to disregard the statement for all purposes but the testing of Dr. Wilson's credibility and opinion. After the jury had been so admonished, the prosecutor read to Dr. Wilson several statements[6] made by defendant during the interview in question and asked whether he had considered them in the formation of his opinion. The statements tended to impeach Dr. Wilson's testimony.

There is no merit in defendant's contention that the statements were read not to challenge Dr. Wilson's credibility and opinion but to bring the previously excluded statement before the jurors in order to inflame their minds against defendant. The statements clearly reflect upon defendant's capacity for premeditation and deliberation as well as his actual state of mind prior to the act in question. Clearly, the statements were inflammatory to some extent, for they reflect a hardened amoral attitude toward the taking of a human life. However, this incidental effect was outweighed by the probative value of the statements as they related to Dr. Wilson's expressed opinion.

Defendant's more serious contention in this regard is that the transcript of the interview, previously excluded because obtained in violation of defendant's constitutional rights, could not form the basis of cross-examination without infringing upon those same rights. He relies on *People* v. *Underwood* (1964) 61 Cal.2d 113 [37 Cal.Rptr. 313, 389 P.2d 937], where it was held that an involuntary statement could not be used to impeach the testimony of the person from whom the statement issued, be he the accused or a witness. It is therefore argued that Dr. Wilson, the court-appointed defense psychiatrist, was in effect giving testimony of the defendant when he described the latter's mental condition and that defendant's statements, inadmissible because of constitutional defects in their acquisition, should not have been used to impeach that testimony.

We have declared that when a defendant, on the advice of counsel, submits to an examination by a psychiatrist appointed pursuant to section 1027, and later specifically places his mental condition into issue at the guilt trial, he can

---

[6]The statements read included defendant's representations that he intended to kill Taddei the night before he did so; that he braided the cord for the purpose of "dusting" Taddei with it; that after the strangling occurred he stuffed toilet paper in Taddei's nose and mouth to make sure that he would not revive; and that he did not cut Taddei down as requested by the jailer because "if I wanted to cut him loose, I wouldn't have tied him up there."

have no complaint if the psychiatrist relates statements made by defendant as matter supportive of his expert opinion, provided the jury is instructed that the psychiatrist's testimony as to defendant's incriminating statements should not be regarded as proof of the facts disclosed but should be considered only to show information upon which the opinion is based. (*In re Spencer* (1965) 63 Cal.2d 400, 411-413 [46 Cal. Rptr. 753, 406 P.2d 33].)[7] Recognizing the importance of accurate psychiatric evaluation in cases involving the mental condition or state of mind of the accused, we have thus endeavored to preserve the effectiveness of psychiatric examination within the framework of constitutional guarantees to the assistance of counsel at all stages of the proceedings.

In the instant case the psychiatrist involved was not appointed pursuant to section 1027 but rather was appointed specifically to aid the defense. Consent of counsel to the use of incriminating statements for purposes of psychiatric evaluation was given not before but after defendant's interview with the police during which the statements had been elicited. Further, the statements here came to light not during the direct examination of the psychiatrist but rather during cross-examination relative to the bases of his expressed opinion. These differences, however, do not render our *Spencer* rationale inapplicable to the instant case. In both situations defense counsel has consented to the use of incriminating statements for the purpose of psychiatric evaluation. In both situations that consent could have been withheld—in the case of the psychiatrist appointed under section 1027 by refusal to submit to examination, and in the case of the psychiatrist appointed in aid of the defense by withholding the pre-existent statements from consideration. In either situation the defense can have no cause for complaint when the incriminating statements are brought to light as one of the bases of the expressed opinion, provided of course that the proper limiting instruction has been given.

We now turn to the contention that the court erred during the trial on the issue of guilt in allowing the prosecutor to comment upon defendant's failure to testify and in instructing the jury in respect to the adverse inferences it might draw from such failure. Defendant asserts that this was a violation of his rights under the Fifth and Fourteenth Amendments of

[7]See *People* v. *Anderson* (1965) 63 Cal.2d 351, 366-368 [46 Cal.Rptr. 763, 406 P.2d 43]; *People* v. *Price* (1965) 63 Cal.2d 370, 379-380 [46 Cal. Rptr. 775, 406 P.2d 55]; *People* v. *Nicolaus* (1967) 65 Cal.2d 866, 879-880 [56 Cal.Rptr. 635, 423 P.2d 787].

the United States Constitution which requires our reversal of the judgment. We examine the comments and the instruction and, although we find that they offend the rules announced in *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229],[8] we conclude that the error is not fatal to the judgment when measured by the harmless error test set forth in *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824].

The comment of which defendant complains was made by the prosecutor during the opening argument to the jury. At this point, the general tenor of the argument was that the testimony of defense witness Dr. Wilson that defendant had not killed Taddei deliberately and with premeditation should not be accepted. It was urged that, the doctor, in forming an opinion on this point, had failed to consider those important facts and circumstances of the crime reflected by the extrajudicial statements with which, as we have said, he had been confronted on cross-examination; and that, despite his failure to consider such facts, the doctor was nevertheless attempting "to tell you what this man, this defendant was thinking." The prosecutor then made the comment objected to which was to the effect that while the doctor was trying to say what defendant meant and was thinking, defendant himself had not done so personally.[9] Defense counsel promptly objected to the remarks and the court "to clarify this matter" advised the jury that it was "a constitutional right of a defendant in a criminal case that he may not be compelled to testify," continuing in language substantially following former CALJIC Nos. 51 and 51-A. (Pertinent CALJIC instructions were substantially revised after *Griffin*.) The prosecutor then resumed the theme of the argument stating that since defendant had a right not to testify, the doctor was being used to say what defendant must have been thinking, in an attempt to establish lack of premeditation.[10]

---

[8]The case was tried before *Griffin* (see fn. 5, *ante*).

[9]The prosecutor stated: "The defendant hasn't told you what he was thinking. He hasn't told you why he did this or how he did this. You don't have the defendant's word—a word from the defendant, but we have Dr. Wilson coming in, based on an examination that he made two months, two months after the killing, to tell you what the defendant meant and what the defendant's thoughts were. Now, I told you in the *voir dire*, you are aware that the prosecution can't call the defendant or force him to take the stand. Nobody can force him to take the stand. And he didn't take the stand in this case. If he did take the stand, he would have been subject to cross-examination. He would have been subject to impeachment, just like any other witness is."

[10]The prosecutor stated: "So, ladies and gentlemen, in this case, that

In its subsequent instructions to the jury, the court gave an instruction which consisted of former CALJIC Nos. 51, 51-A and 51-B, word for word.[11]

It is manifest, from any fair reading of his remarks, that the prosecutor commented on defendant's failure to take the stand, and that the court, in language identical with that condemned in *Griffin*, instructed the jury with respect to such failure. The conclusion is ineluctable that both the comment and the instructions are violative of the constitutional principles proclaimed in *Griffin*. ■■■ Since we face federal constitutional error, we must determine whether it is harmless under the rules set forth in *Chapman*. Applying this test, we inquire whether, under all the circumstances of the instant case, it is possible "for us to say that the State has demonstrated, beyond a reasonably doubt, that the prosecutor's comments and the trial judge's instruction did not contribute" (*Chapman* v. *California*, *supra*, 386 U.S. at p. 26 [17 L.Ed.2d at p. 711]) to defendant's conviction.

■■■ We initially observe, as we did recently in *People* v. *Modesto* (1967) 66 Cal.2d 695, 712 [59 Cal.Rptr. 124, 427 P.2d 788], that the instant case, unlike *Chapman*, is manifestly not a case "in which, absent the constitutionally forbidden comments, honest, fair-minded jurors might very well have brought in not-guilty verdicts." (*Chapman* v. *California*, *supra*, 368 U.S. at pp. 25-26 [17 L.Ed.2d at p. 711].) To put it in another way, still in the context of *Chapman*, we do not face a situation where forbidden comment "finds its way

being the right of the defendant to not testify if he doesn't see fit, we have Dr. Wilson brought in to tell us what he was thinking or must have been thinking. The specific purpose for Dr. Wilson's testimony was to tell you that Mr. Morse, Joe Morse, did not premeditate or deliberate this killing. The doctor doesn't care what the facts were that might indicate otherwise.''

[11]It is sufficient for our purposes to set forth only the following pertinent part: "As to any evidence or facts against him which the defendant can reasonably be expected to deny or explain because of facts within his knowledge, if he does not testify or if, though he does testify, he fails to deny or explain such evidence, the jury may take that failure into consideration as tending to indicate the truth of such evidence and as indicating that among the inferences that may be reasonably drawn therefrom those unfavorable to the defendant are the more probable. *In this connection, however, it should be noted that if a defendant does not have the knowledge that he would need to deny or to explain any certain evidence against him, it would be unreasonable to draw an inference unfavorable to him because of his failure to deny or explain such evidence.''* (Emphasis added.) It will be noted that the last sentence is former CALJIC No. 51-A which the court interpolated immediately before the last sentence of former CALJIC No. 51. In each instance however the language remains unchanged.

into a trial in which the question of guilt or innocence is a close one." (386 U.S. at p. 22 [17 L.Ed.2d at p. 709].) The circumstances of the crime—the victim garrotted against the bars of defendant's cell with a cord from defendant's own mattress, defendant's full and clear acknowledgment of the act, the noninvolvement of any other participant—present overwhelming evidence that defendant was guilty of first degree murder. We deem it highly improbable that a jury responsible to its oath would have returned a different verdict had the above comments and instructions not been made and given.

Nevertheless, as we recently acknowledged in *Modesto,* we cannot according to the *Chapman* test properly discard constitutional error and uphold a conviction "simply because we deem it improbable that a result more favorable to the defendant would have been reached in the absence of the *Griffin* error; . . ." (*People* v. *Modesto, supra,* 66 Cal.2d at p. 712.) *Chapman* adheres to the "approach" followed in *Fahy* v. *Connecticut* (1963) 375 U.S. 85, 86 [11 L.Ed.2d 171, 173, 84 S.Ct. 229], as to "'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction'" and incorporates such rationale within its formulation "requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman* v. *California, supra,* 386 U.S. at p. 24 [17 L.Ed.2d at p. 710].) This rule neither requires nor permits us to discern prejudice in *any possible* influence which the error may have on the jury. We have already taken pains to point out that a reversal of a conviction is not compelled "for the sole reason that we *might* be able to conceive of *some possibility,* however remote, that a jury *could* have been marginally influenced by the comment in question. The *Chapman* test is couched in terms of 'reasonable doubt' and . . . a reasonable doubt must be more than a 'possible' doubt, . . ." (*People* v. *Modesto, supra,* 66 Cal.2d at p. 712.)

We therefore inquire as to whether there was a *reasonable* possibility that the jury was materially influenced by the comment or the instruction. It will be recalled that the prosecutor's comment arose during his discussion of the defense testimony of Dr. Wilson. In essence, this was that because of his sociopathic personality, background, and environment, defendant's acts in killing Taddei were instinctual and automatic. The prosecutor challenged this expert opinion

as having been formed by ignoring certain facts and as being an attempt to tell the jury what "this defendant was thinking." It was at this point that the objectionable remarks were interjected. The comment was brief and mild and not uttered with "machine-gun repetition" and devastating effect as in *Chapman*. (*Chapman* v. *California, supra,* 386 U.S. 18, 26 [17 L.Ed.2d 705, 711].) It is at once apparent that the comment did not "touch a live nerve in the defense, . . ." (*People* v. *Modesto, supra,* 66 Cal.2d at p. 714.) The vital issue under discussion was defendant's capacity to premeditate or deliberate as discernible from an examination of him. The psychiatric testimony alone was relevant to an inquiry on this point and defendant's own impressions or opinion in respect to his capacity would be of little value. His views would have been of no more significance than the questionable thinking of a schizophrenic on the etiology of his own particular disorder. Thus the comment could reasonably have had no significant impact on the case in defense.

The court's instructions were similarly of minimal influence. The instruction given the jury at the time of the prosecutor's remarks must be assessed in its particular setting and therefore in the light of the argument on Dr. Wilson's testimony. The record shows that at this point in the proceedings, as well as in the final instructions to the jury, the court instructed in the language of former CALJIC No. 51-A (see italicized portion of fn. 11, *ante*) as to when it would be unreasonable to draw an inference unfavorable to defendant. The jury, aware that the psychiatric testimony was under discussion, were thus told in effect that they should not draw an adverse inference from defendant's failure to testify if defendant did not have the requisite knowledge. It must have been obvious to them that defendant could have made no contribution to the expert appraisal of his own capacity. The instruction at the close of the arguments was substantially a reiteration of the foregoing (see fn. 11, *ante*). While it had broad application to the entire case, the only other live issue to which it could reasonably relate was the commission of the criminal act itself on which, as we have pointed out, the evidence was overwhelming and the defendant's confession was full and unequivocal. We therefore do not see how the court's instruction could have materially influenced the jury under any pertinent aspect of the case. Upon a consideration of the entire record, we are satisfied that there is no resonable

possibility that the error contributed to the verdict and we believe that it was harmless beyond a reasonable doubt.

Defendant next contends that the court erroneously failed to give instructions on manslaughter. He urges that there was here presented evidence which, if believed, would negate the malice required for murder, and he contends on the basis of *People* v. *Modesto* (1963) 59 Cal.2d 722 [31 Cal.Rptr. 225, 382 P.2d 33], that refusal to instruct on manslaughter in the face of such evidence constitutes reversible error.

As we have said, the defense in the instant case was based entirely upon the testimony of the defense psychiatrist, Dr. David Wilson, relative to defendant's capacity to entertain the mental states necessary to first degree murder. At defendant's request the court gave the standard instructions on how intent is manifested (CALJIC No. 73 modified in particulars not here in question) and on defendant's diminished capacity to form the requisite specific intent or have the requisite mental state to constitute the crime charged (former CALJIC No. 73-B),[12] commonly referred to as the *Wells-Gorshen* rule.[13] But the court did not give instructions on manslaughter and in fact refused three instructions requested by defendant,[14] presumably on the theory that the evidence presented, while tending to negate premeditation and deliberation, did not tend to negate malice aforethought.

[12]The diminished capacity instruction given, former CALJIC No. 73-B, read as follows: ''You are reminded that a person might be legally sane, as we define that term in dealing with the question of criminal responsibility, and yet be in an abnormal mental or nervous condition; and because of such condition he might be less likely or unable to have or to hold a specific intent or a certain state of mind, which is an essential ingredient of a certain crime. We have received evidence bearing on the mental and nervous condition of the defendant at the time of the alleged commission of the crime charged. Such evidence may be considered by you in determining whether or not defendant did any act charged against him and, if so, whether or not, at that time, there existed in him the specific mental factor and intent which must accompany that act to constitute a certain crime or degree of crime. You do not [at this time] have before you any issue as to defendant's legal sanity.''

[13]See *People* v. *Wells* (1949) 33 Cal.2d 330, 350 [202 P.2d 53]; *People* v. *Gorshen* (1959) 51 Cal.2d 716, 733 [336 P.2d 492]; *People* v. *Henderson* (1963) 60 Cal.2d 482, 489-490 [35 Cal.Rptr. 77, 386 P.2d 677]; *People* v. *Anderson* (1965) 63 Cal.2d 351, 364 [46 Cal.Rptr. 763, 406 P.2d 43] and authorities there collected; *People* v. *Conley* (1966) 64 Cal.2d 310, 316-318 [49 Cal.Rptr. 815, 411 P.2d 911]; *People* v. *Nicolaus* (1967) 65 Cal.2d 866, 876-877 [56 Cal.Rptr. 635, 423 P.2d 787]; *People* v. *Goedecke* (1967) 65 Cal.2d 850, 855 [56 Cal.Rptr. 625, 423 P.2d 777].

[14]Defendant requested CALJIC No. 305-AA (doubt whether murder or manslaughter), No. 310 (murder and manslaughter distinguished) and No. 311-A (no specific passion alone constitutes heat of passion).

" 'It is *elementary* that the court should instruct the jury upon every material question upon which there *is any evidence deserving of any consideration whatever.* [Citations.] *The fact that the evidence may not be of a character to inspire belief does not authorize the refusal of an instruction based thereon.* [Citations.] That is a question within the exclusive province of the jury. *However incredible the testimony of a defendant may be he is entitled to an instruction based upon the hypothesis that it is entirely true.'* " (*People* v. *Carmen* (1951) 36 Cal.2d 768, 773 [228 P.2d 281].) In *Carmen* we held the refusal of a manslaughter instruction to be reversible error when there was evidence warranting a conviction of manslaughter. Commenting on this holding we subsequently observed in *People* v. *Modesto, supra,* 59 Cal.2d 722, 730: "Reversal is not required because of a reasonable probability that in the absence of the error the jury would have reached a different verdict [citation], but because the defendant has a constitutional right to have the jury determine every material issue presented by the evidence. Regardless of how overwhelming the evidence of guilt may be, the denial of such a fundamental right cannot be cured by article VI, section 4½ [now art. VI, § 13], of the California Constitution, for the denial of such a right itself is a miscarriage of justice within the meaning of that provision." It is therefore apparent that the judgment herein must be reversed if there was presented "any evidence deserving of any consideration whatever" which tended to negate malice aforethought and therefore would warrant conviction of manslaughter as "the unlawful killing of a human being, without malice." (§ 192; and see CALJIC No. 310, requested by defendant and refused as to the distinction between murder and manslaughter.

The success of defendant's efforts to find some evidence negating malice aforethought and compelling instructions on manslaughter depends on the testimony of defendant's witness Dr. Wilson, upon which the entire defense rested. We may fairly summarize his testimony as to the mental condition of defendant at the time of the homicide thusly: Defendant suffers from a medically recognized character disorder known as sociopathic personality, anti-social type. One of the qualities of this type of disorder is that it renders the subject to some extent incapable of relating to the world outside him in terms of customary social morality, so that he becomes in some sense a law unto himself, answerable in moral terms only to

himself. Superimposed upon this character disorder in the case of defendant is the fact that a great portion of his life has been spent in a custodial environment, wherein the value of practical comforts tends to be exaggerated—especially for a person suffering from a sociopathic character disorder. Further, within such a culture retaliation is both the expected and the acceptable method of dealing with personal affronts. Therefore, within this context of personality disorder and custodial environment, defendant's reaction to Taddei's conduct was both consistent and psychologically predictable. In sum, because of such disorder and the cultural pressures of defendant's environment, Taddei's behavior provoked defendant into committing the homicide. Once this situation arose, defendant had no control over the following events and his actions were instinctual.[15]

---

[15]Illustrative of Dr. Wilson's opinion are the following excerpts of his testimony: ''I felt that he is described clinically as being [sic] a sociopathic personality disorder, the anti-social type. . . . It was my opinion that the cultural pressures which were just mentioned, which was namely, the culture that a person exists in when he lives in a prison environment for the majority of his life, and also the cultural environment of living on death row for an extended period of time, changed his value systems. In other words, the things that might provoke one into an act are considered in light of all the circumstances. One can be provoked at one time and not another. One person can be provoked by different things.

''Because of the personality disorder and because of the environment in which he lived, it was my opinion that the acts of the victim which led to the homicide in question did in truth provoke his particular actions, namely that of the homicide.''

Dr. Wilson further explained: ''Q. [Mr. Rickles, attorney for defendant] Did you form an opinion, Doctor, as to whether or not once this situation arose that Mr. Morse had any control over the events that followed, sir?

''A. Yes, I formed such an opinion.

''Q. What was your opinion as to that, sir?

''A. Once the act began, his actions were those of an instinctual nature. . . . Instinct. In other words, there was an automatic response. Given the circumstances and the precipitating factors, he then acted without any particular thought. It was merely the appropriate thing to do, and no thought was given to the act. The act merely took place as a matter of course. . . .

''MR. RICKLES: Q. Doctor, could you advise us as to what the defendant's action would be attributable to? . . .

''A. The circumstances of the homicide were, as according to the defendant's statements, were that there was a game in which the victim lost and, therefore, was expected to pay a carton of cigarettes as the gambling debt and announced that he was not able to do this because he had no funds.

''This angered the defendant, but they agreed upon a substitute payment, namely, that of one dessert for each of the ten packs of cigarettes over ten to sixteen days.

''At a later time the victim welched on his gambling debt, which again

We may therefore distill from the foregoing testimony the following theories of defense: First, defendant did not act deliberately or with premeditation but automatically and "instinctually"; secondly, the victim's conduct was adequate provocation for the killing. Defendant's position is that either theory eliminates malice aforethought.

■ We consider the latter theory first. Here the technique of the defense was to assert provocation and thus to establish its legal sufficiency as an element of manslaughter (see *People* v. *Valentine* (1946) 28 Cal.2d 121, 137 [169 P.2d 1]), thereby reducing the charge from murder to voluntary manslaughter. ■ However in order to determine whether the element of provocation has thus displaced the element of malice aforethought and effectuated such a reduction of the offense, it is settled that "the fundamental of the inquiry is whether or not the defendant's reason was, at the time of his act, so disturbed or obscured by some passion—not necessarily fear and never, of course, the passion for revenge —to such an extent as would render *ordinary men of average disposition* liable to act rashly or without due deliberation

---

angered the defendant, at which time he decided that he would retaliate by beating him up or punishing him in some way.

"Subsequent to this, in the final last straw, was an act that was provocative in the eyes of the defendant, namely, the victim came to the wall or the bars of the cell and had the temerity to ask him or·try to bum a cigarette from him. That was the precipitating factor that resulted in the homicide.

"Now, where this in itself might be considered annoying to the normal mind, to the mind of the defendant here, this was the justifiable basis for the act, for two reasons:

: "One, because of his personality disorder, he doesn't have the capacity to think in terms of usual values of morality. He is without the ability, in other words, to think in moral terms. In other words, taking of a life can be justified on many means. We think of it as being the supreme sort of act. To a person of this sort, it is just another act, and it can follow as a result of many things, even something minor such as this.

"Furthermore, we have, in addition to the mental condition of this person without a moral sense, in other words, we have the cultural environment wherein it is understood in this particular setting, since life is itself no longer of great consequence on death row, everything else becomes extremely important. They have nothing else but cigarettes. This is the only value they have, because life has been already forfeited. Consequently, things assume an exaggerated proportion, including something like this. Furthermore, we have the cultural factor that when a person provokes another person in this culture, retaliation is expected. In other words, a person asks for it. By doing a certain act, he can expect a retaliation. Retaliations can vary. Under the circumstances here, this would be an appropriate sort of thing in this particular culture, so we have a series of circumstances that, taken in the abstract, appear to be of no great· value. Under the circumstances· of this particular mental condition and the environment, it explains quite satisfactorily from a·psychological sense the act that occurred."

and reflection, and from this passion rather than from judgment." (Italics added.) (*People* v. *Logan* (1917) 175 Cal. 45, 49 [164 P. 1121]; *People* v. *Valentine, supra,* 28 Cal.2d 121, 139; *People* v. *Danielly* (1949) 33 Cal.2d 362, 377-378 [202 P.2d 18]; *People* v. *Borchers* (1958) 50 Cal.2d 321, 329 [325 P.2d 97].) ▮▮▮ It is clear that the provocation here involved was not such that it would have the indicated result upon "ordinary men of average disposition," and that the evidence of defendant's extraordinary character and environmental deficiencies was manifestly irrelevant to the inquiry.

▮▮▮ We now turn to consider whether there is any evidence under the first theory which will negate malice aforethought. As we indicated in *People* v. *Conley* (1966) 64 Cal.2d 310, 318 [49 Cal.Rptr. 815, 411 P.2d 911], the enumeration of nonmalicious homicides contained in section 192[16] is not complete. Since section 192 was enacted prior to the development of the concept of diminished capacity (see fn. 13, *ante*) it did not include those nonmalicious homicides in which there is a lack of malice resulting from a diminished capacity to entertain that mental state. Consistently with this analysis, we noted that "a finding of provocation sufficient to reduce murder to manslaughter is not the sole means by which malice can be negated and voluntary manslaughter established." (64 Cal.2d at p. 318.)

▮▮▮ We therefore delineated in *Conley* a standard to be applied in the determination of whether, in cases involving diminished capacity, the state of mind amounting to malice aforethought is present: "An intentional act that is highly dangerous to human life, done in disregard of the actor's awareness that society requires him to conform his conduct to the law, is done with malice regardless of the fact that the actor acts without ill will toward his victim or believes that his conduct is justified. . . . Thus, one who commits euthanasia bears no ill will toward his victim and believes his act is morally justified, but he nonetheless acts with malice if he is able to comprehend that society prohibits his act regardless of

---

[16]Section 192 provides in pertinent part as follows: "Manslaughter is the unlawful killing of a human being, without malice. It is of three kinds:

"1. Voluntary—upon a sudden quarrel or heat of passion.

"2. Involuntary—in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection; provided that this subdivision shall not apply to acts committed in the driving of a vehicle.

"3. In the driving of a vehicle— . . ."

personal belief. If because of mental defect, disease, or intoxication, however, the defendant is unable to comprehend his duty to govern his actions in accord with the duty imposed by law, he does not act with malice aforethought and cannot be guilty of murder in the first degree." (*People* v. *Conley, supra,* 64 Cal.2d 310, 322.)

The evidence heretofore summarized by us provides no basis whatsoever for a finding that defendant's act was accomplished in the absence of malice aforethought. Nowhere is it intimated that defendant lacked an awareness that his act was contrary to the laws of society. Rather, the testimony of Dr. Wilson posits such awareness and proceeds upon the theory that defendant's personality disorder and the effects of his environment rendered him disinclined to or incapable of conforming his conduct accordingly. Such a state of mind cannot amount to an absence of malice aforethought as we have defined that term in *Conley*. Though defendant's conduct may in fact have been in some sense "psychologically predictable," under the present law of the State of California this fact does not of itself affect his criminal liability.[17]

It therefore appears that, since defendant presented no evidence in support of a finding that his diminished capacity rendered him incapable of entertaining malice aforethought, and further, since he presented no evidence indicating provocation of the sort required by section 192, the trial court properly refused to instruct on the law of manslaughter. (*People* v. *Modesto, supra,* 59 Cal.2d 722, 730; cf. *People* v. *Saterfield* (1967) 65 Cal.2d 752, 759-760 [56 Cal.Rptr. 338, 423 P.2d 266].)

Defendant next contends that the trial court erred when it allowed, over strenuous objection, a court-appointed psychiatrist, Dr. Elmer Haynes, to testify as a part of the prosecution's case-in-chief relative to a confession made by defendant to him during psychiatric examination. The facts relevant to this contention are the following: On September 11, 1964, about a month after the killing of Taddei, Dr. Haynes and another doctor were appointed by the court, in view of defendant's then outstanding pleas of not guilty and not guilty by reason of insanity, for the purpose of determining defendant's mental condition at the time of the offense.

[17]See and compare Tentative Draft No. 2, Penal Code Revision Project of Joint Legislative Committee for Revision of Penal Code (1968), § 530, p. 72.

(§ 1026.) Defendant was at that time represented by counsel, and counsel was present in court at the time of the appointment. On September 26, 1964, Dr. Haynes went to the San Diego County jail in order to examine defendant, but he then learned that, due to a change of venue, defendant had two days before been transferred to the Orange County jail. On September 28 or 29, 1964, Dr. Haynes spoke with the member of the San Diego District Attorney's office assigned to try the case, who explained the situation and told Dr. Haynes to perform the examination at the Orange County jail.

That same day, September 29, 1964, defendant's attorney filed in the Orange County Superior Court a motion to be heard October 9 for an order appointing a psychiatrist of defendant's own choice and an order restraining examination by the previously appointed psychiatrists. The notice of motion was not received by the San Diego District Attorney until October 1 or October 2. On October 3, Dr. Haynes, without knowledge of the motion, went to the Orange County jail and performed a psychiatric examination upon defendant. On October 9 defendant's motion to restrain examination was denied, the court, however, granting the motion to appoint a psychiatrist (see fn. 4, *ante*).

At the trial, and as a part of the prosecution's case-in-chief, Dr. Haynes, over strong objection, testified as to what defendant had told him at the psychiatric examination. We set forth the testimony below.[18] Dr. Haynes was then asked

---

[18]Dr. Haynes testified: ''After spending some time with Mr. Morse I asked him why he was in jail or why he was in the Orange County Jail and he said he was charged with killing an inmate in the San Diego County Jail on 8-14-64. When I asked him about some of the details he stated that he had been playing dominoes; that he was in a locked cell; that during the process of playing dominoes the inmate lost a carton of cigarettes to Mr. Morse. Then it turned out that the inmate did not have the money with which to buy the cigarettes and this was quite upsetting to Mr. Morse. In fact, he said it made him mad. Then there was some—he stated that the other, the inmate was suppose [*sic*] to give him a dessert at night, at dinner time, and he said that the meal came, it was served, and that he did not get the dessert. . . .

''Mr. Morse made some remark about the inmate which indicated that Mr. Morse was quite upset at the time. Also I asked him about how they played dominoes and he said they played it on the floor underneath the lower railing, I guess, not having been in the jail to observe. This is the way I understood it. And that Mr. Morse said that he had prepared from the mattress a rope or cord that he used to use in exercises, pull-up exercises to get some exercise; that during the night—prior to 8-14-64, added a length of this rope or cord, and if he got a chance he would use it on the other inmate. Then he said that around 8:00 o'clock or thereabouts that the inmate asked him for a cigarette. He walked over to Mr. Morse's jail, Mr. Morse jumped up, he had this rope in his hand at the time the

whether, on the basis of this information, he had an opinion as to whether defendant was "capable of forming a specific intent to kill" at the time of the offense. Defendant's objection on the basis of lack of foundation was sustained.

After Dr. Wilson had testified for the defense, Dr. Haynes was called in rebuttal. He was then asked whether he had, on the basis of his examination, formed an opinion as to whether defendant was capable of premeditation and deliberation at the time of the offense. He answered in the affirmative, and testified that "The basis for this would be the fact that he told me that the night before he extended the length of the so-called rope that he made from the mattress and that also if he got a chance he was going to use it, and at that time we were talking about the victim." He also testified that the fact that defendant had some two hours before the killing threatened to kill Taddei (a fact established by other evidence) indicated premeditation and deliberation. No limiting instruction was requested or given regarding the jury's consideration of the declarations testified to by Dr. Haynes.

We are thus presented with a factual situation strikingly similar to that which we faced in the case of *In re Spencer, supra,* 63 Cal.2d 400. (See also fn. 7, *ante.*) We there said that "if defendant's statements to the psychiatrist may be introduced at the guilt trial, defendant's need of counsel is as acute during the psychiatric interview as during the police interrogation" and that if the psychiatrist's testimony as to such statements was to be admissible, defendant "was entitled to the presence of counsel during the psychiatric examination." Recognizing, however, that the presence of counsel might impede or disrupt the examination and "might thus frustrate the legislative goal of obtaining the evaluation of defendant's mental state by an impartial expert in the event of an insanity plea," we also pointed out in *Spencer* "that the presence of counsel at the psychiatric examination is not constitutionally required so long as certain safeguards are afforded to defendant." (63 Cal.2d at pp. 410-412 *passim.*) ·

Accordingly we there said: "If, after submitting to an

---

other man came, he turned around, he used his arms to get the rope through the bars, looped it around the man's neck, pulled him back and choked him. Then after several minutes he felt he went limp, he let him down. He was on the floor. That he had the rope around the neck or pulled the man's neck or head up against the bar and tied the rope tight. And that he was found dead some 15, 20 minutes later. And I asked him if anyone said anything to him or if he said anything and he said, well, I think he made the remark or remembers making the remark: 'That S.O.B. should have paid his debt.' "

examination, a defendant does not specifically place his mental condition into issue at the guilt trial, then the court-appointed psychiatrist should not be permitted to testify at the guilt trial. If defendant does specifically place his mental condition into issue at the guilt trial, then the court-appointed psychiatrist should be permitted to testify at the guilt trial, but the court should instruct the jurors that the psychiatrist's testimony as to defendant's incriminating statements should not be regarded as proof of the truth of the facts disclosed by such statements and that such evidence may be considered only for the limited purpose of showing the information upon which the psychiatrist based his opinion. [Fn. omitted.]'' (*In re Spencer, supra,* 63 Cal.2d at p. 412.)

In the instant case, the parties are in dispute as to whether defendant *did* ''specifically place his mental condition into issue'' *before* Dr. Haynes' testimony was introduced on the prosecution's case-in-chief. We need not determine this point, however, for it clearly appears that Dr. Haynes' testimony relative to defendant's incriminating statements was received without admonition or instruction to the jury that such testimony ''should not be regarded as proof of the truth of the facts disclosed by such statements and that such evidence may be considered only for the limited purpose of showing the information upon which the psychiatrist based his opinion.'' (*In re Spencer, supra,* 63 Cal.2d 400, 412.) This was error.

Nevertheless we conclude that such error did not result in prejudice to defendant. In bare essence, the substance of Dr. Haynes' testimony was that defendant garrotted another inmate with a cord woven from his mattress. There was no dispute that defendant was the person who killed Taddei. Moreover, there was a great amount of persuasive evidence, apart from Dr. Haynes' testimony as to defendant's statements, to show that the killing was premeditated and malicious. There was, for instance, the testimony of Murray Wallace, a trusty at the San Diego County jail, to the effect that he heard defendant threaten to kill Taddei a short time before he carried out the threat. Further, there was the statement of defendant himself to Murkerson that he had killed Taddei because ''The sonofabitch wouldn't pay his debts.'' In view of this evidence and of all the circumstances of the crime upon which we have commented already in our consideration of the *Griffin* error, we do not see how the reception of the above testimony could have materially influenced the jury. Upon the entire record we believe that the above error con-

sidered either alone or in combination with the aforementioned *Griffin* error was harmless beyond a reasonable doubt. (*Chapman* v. *California, supra,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710].)

For the foregoing reasons we have concluded that the judgment insofar as it relates to guilt must be affirmed. However, under the compulsion of *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], we must reverse the judgment insofar as it relates to penalty because certain prospective jurors were excused for cause in violation of the standards set forth in that case.

In the instant case ten veniremen were excused for cause because of their conscientious opinions relative to the death penalty. (See Pen. Code, § 1074, subd. 8; *People* v. *Gonzales* (1967) 66 Cal.2d 482, 497 [58 Cal.Rptr. 361, 426 P.2d 929]; *People* v. *Riser* (1956) 47 Cal.2d 566, 575-576 [305 P.2d 1].) Of these we need discuss only three.

On the first day of jury selection proceedings—after the assembled panel had been sworn, 12 prospective jurors drawn and seated, and the indictment read—the court proceeded to address certain routine preliminary remarks and inquiries to the prospective jurors in the box. At the conclusion of these the court made the following statement: ''The next question I am going to ask is relative to the matter of the death penalty. And by way of preface, I will say I am asking this question myself at this time only to save time in the case, so that if there is anybody who wants to express themselves they may do so now. It has been brought to the attention of the Court in this matter that the District Attorney, if there is a conviction of first degree murder in this case, intends to ask for the death penalty. In the event we get to that phase of the case, the duty may come to the jury of determining whether the defendant would have to suffer the death penalty or imprisonment for life. And in the event that question does come it would be this jury which would have that question. In order to save time I am going to ask the question now: Is there anybody on the jury panel as it now stands who has such a conscientious opinion relative to the death penalty as would preclude him from concurring in a verdict carrying the death penalty in a proper case?''

Apparently one of the prospective jurors seated in the box raised his hand in response to this inquiry. Upon oral confirmation of his affirmative answer, he was immediately excused without further questioning, and two veniremen whose names

were successively drawn to fill his place in the box were also promptly excused upon giving affirmative answers to almost identical questions. The relevant proceedings are set forth in the footnote.[19]

In the recent case of *People* v. *Teale* (1969) *ante,* p. 497 [75 Cal.Rptr. 172, 450 P.2d 564], we explained the possibilities of misunderstanding which lurk within the phrase ''in a proper case'' and concluded that in light of these dangers ''it cannot reasonably be said that a venireman, merely by affirm-

---

[19]''THE COURT [following its inquiry, set forth above, relative to a conscientious opinion preventing concurrence in a death verdict 'in a proper case']:

''Mr. Holmes, you have such a conscientious objection?

''JUROR HOLMES: Yes, sir.

''THE COURT: All right.

''Anybody else? I know this may have been put to you a bit suddenly. If you want a moment to reflect. I am assuming, from what you stated, Mr. Stahl [the prosecutor], that you desire jurors to be excused who have such a conscientious objection?

''MR. STAHL: If it please the Court, yes. It may save further time.

''I think Mr. Holmes has indicated his feelings about that subject, and I believe that is a ground for challenge.

''THE COURT: All right.

''Mr. Holmes, then you are excused. If you will take your seat in the courtroom we will find out if they need you someplace else.

''THE CLERK: No. 16, Louise I. Jefferis.

''THE COURT: Mrs. Jefferis, have you been able to hear all of the questions I asked the other jurors?

''JUROR JEFFERIS: Yes, I have.

''THE COURT: And except to the last question, relating to the death penalty, would you answer any of the questions differently from the answers given by the other jurors to the same questions?

''A. No.

''Q. And relating to the matter of the death penalty, do you have such a conscientious objection relative to the death penalty as would preclude you from concurring in a verdict carrying the death penalty in a proper case?

''A. I am afraid I would have to say yes to that.

''THE COURT: All right. You are excused.

''THE CLERK: No. 19, Margery Lamarand.

''THE COURT: Mrs. Lamarand, have you been able to hear all of these proceedings?

''A. Yes, I have, your Honor.

''Q. If you were asked the same questions put to the other jurors, excluding the last one, would your answers to those same questions be any different from the answers that they gave?

''A. No.

''Q. Have you had service as a trial juror?

''A. Yes.

''Q. Have you had service on a criminal case?

''A. Yes.

''Q. And do you have such a conscientious objection relative to the death penalty that would preclude you from concurring in a verdict carrying the death penalty in a proper case?

''A. I am afraid so, sir.

''THE COURT: All right, you may step down.''

ing that he harbors conscientious scruples which would prevent his concurrence in a verdict of death 'in a proper case,' thereby (i.e., by means of that bare affirmation) 'ma[kes] unmistakably clear . . . that [he] would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before [him]. . . .' [*Witherspoon* v. *Illinois*] (391 U.S. at p. 522, fn. 21 [20 L.Ed.2d at p. 785].)'' *ante* at p. 516.) Then, noting that the dangers inherent in bare ''proper case'' language can in some cases be ameliorated or eliminated by additional language uttered by court or counsel in the course of the entire *voir dire* examination (see *People* v. *Varnum* (1969). *ante*, pp. 480, 492 [75 Cal.Rptr. 161, 450 P.2d 553]), we examined the ''proper case'' question and the venireman's response thereto ''in the full context and setting of the *voir dire* examination conducted up until the time [the venireman] was excused.'' (*People* v. *Varnum, supra, ante,* pp. 497, 517). However, the indicated scrutiny did not in *Teale* reveal that the dangers inherent in the ''proper case'' language used were dispelled in light of the full context of the questions in which such language appeared, and we therefore concluded that the veniremen who affirmatively answered such questions had not thereby made it '' 'unmistakably clear' that their scruples against capital punishment rendered them incapable of exercising the sole discretion contemplated by sections 190 and 190.1 of the Penal Code because they would *automatically* vote against the imposition of the death penalty regardless of the evidence.'' (Fn. omitted.) (*Ante,* at p. 519.) The judgment was accordingly reversed as it related to penalty.

The same result must follow in the instant case. Manifestly the court's introductory remarks relative to the death penalty, which we have set forth in full above, were insufficient to dispel the hazards of misapprehension inherent in the ''proper case'' question with which each of the three subject veniremen was confronted. Clearly those remarks cannot be read to inform the panel that ''What constitutes a proper case is . . . for the juror to decide.'' (*People* v. *Bandhauer* (1967) 66 Cal.2d 524, 531 [58 Cal.Rptr. 332, 426 P.2d 900].) In such circumstances we cannot conclude that the veniremen in question, through their affirmative answers to the court's questions, thereby made it ''unmistakably clear'' that their scruples against capital punishment rendered them incapable of exercising the sole discretion contemplated by sections 190 and 190.1 of the Penal Code because they would automatically

vote against the imposition of the death penalty regardless of the evidence presented in the particular case. *Witherspoon* therefore requires that the judgment be reversed insofar as it relates to penalty.

We proceed to treat certain of defendant's contentions for the guidance of the court upon retrial of the issue of penalty.

Defendant contends that the court committed error during the trial on the issue of penalty in permitting the prosecution to prove that defendant had taken a knife to court during an earlier penalty trial relative to the murders of his mother and sister. At the penalty trial in the instant case the prosecution called as a witness the officer who had acted as bailiff during the penalty trial in the earlier case. The officer testified without objection that while that earlier proceeding was in progress a homemade knife fell from defendant's pocket to the courtroom floor; that he recovered the knife and whispered to defendant, asking him, ''Joe, what are you trying to do?''; that defendant made no answer but only ''hung his head''; that a recess occurred shortly thereafter during which defendant was searched for further weapons.

The prosecution next called Richard T. Sullivan, a reporter who had been present at the earlier penalty trial, who testified over objection on the ground of improper foundation that he and another reporter had had a conversation with defendant after the jury had returned its verdict in the earlier penalty trial; that this conversation was with the consent of defendant's attorney; that defendant was asked, ''Who were you going to use it [the knife] on, . . . A witness?''; and that defendant replied affirmatively and then added, ''If I had a chance'' or ''If I could.''

The prosecutor in his summation emphasized this testimony and invited inferences from it as to defendant's character and temperament.

Defendant contends that it was error to admit defendant's statements made in response to the reporter's questions. He contends that the court should not have admitted defendant's extrajudicial statement of this ''prior crime'' without first requiring that the prosecution prove *aliunde* the corpus delicti.

We need not speculate on which ''crime'' defendant committed by carrying a makeshift knife to the courtroom. Nor need we examine whether the bailiff's testimony, given with-

out objection, proved the corpus delicti of that crime. No criminal proceedings were initiated as a result of defendant's conduct. The evidence was received not as evidence of a prior crime but as matter relating to defendant's attitudes and values. Section 190.1 permits the introduction at the penalty trial of evidence ". . . of the defendant's background and history, and of any facts in aggravation or mitigation of the penalty." Here, as in *People* v. *Corwin* (1959) 52 Cal.2d 404 [340 P.2d 626], the defendant's statements showing his attitude toward the killing with which he is charged, as well as his attitude toward the taking of human life in general, are relevant to the inquiry contemplated by the statutory direction, and admissible in the absence of unusual circumstances not here present. (See also *People* v. *Tahl* (1967) 65 Cal.2d 719, 734-736 [56 Cal.Rptr. 318, 423 P.2d 246].)

Defendant's final contentions concern the use at the trial on the issue of penalty of certain extrajudicial statements, courtroom testimony, and other evidence relating to his earlier trial for the murder of his mother and sister. (See *People* v. *Morse* (1964) 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810].) We have today held that the murder convictions in that case must be reversed because of the erroneous admission therein of an extrajudicial confession obtained in violation of defendant's rights under the Fifth, Sixth, and Fourteenth Amendments. (*In re Morse, ante,* p. 702 [76 Cal.Rptr. 391, 452 P.2d 601].) We now consider inter alia, the effect of that holding upon the instant case.[20]

A. As we have explained in *In re Morse, supra,* two extrajudicial statements given by defendant were introduced against him at the trial in *Morse I.* The first of these was given in a police car on the way from the scene of the crime to the police station; the second, whose introduction in *Morse I* has required that we vacate the judgment therein (*In re Morse, supra*), was given upon arrival at the police station. The trial of the instant case (*Morse II*) took place in the interim between our first and second *Dorado* decisions,[21] and the

[20] For purposes of convenience and clarity we shall hereafter refer to the 1962-1963 trial of defendant for the murder of his mother and sister, which trial produced the judgment affirmed as to guilt in *People* v. *Morse, supra,* 60 Cal.2d 631, and vacated today *In re Morse, ante,* p. 702, as *Morse I;* we shall refer to the 1964 trial of defendant for the murder of Thomas Taddei, which is the subject of the instant appeal, as *Morse II.*

[21] In *People* v. *Dorado* our first decision was filed on August 31, 1964; a rehearing was granted on September 24, 1964; and our second decision was filed on January 29, 1965. Trial of *Morse II* began on October 21, 1964, and the verdict was returned on November 11, 1964.

trial court sustained defendant's objection to the introduction of the detailed second statement previously introduced in evidence in *Morse I* "on the basis of the *Escobedo* case and what I think the law is in California." The first statement previously introduced in *Morse I* was also offered into evidence through the testimony of Officer Roland, who had been in the police car when the statement was given. Defendant's initial objection was overruled on the ground that the accusatory stage had not been reached when the statement commenced, but the trial court excluded all but the first portion of the statement on the ground that the crucial stage was reached upon the first question and answer in the statement.[22] We set forth in the footnote the pertinent testimony through which such portion of the first statement was admitted.[23]

As we have noted in *In re Morse, supra, ante,* p. 702, in the event of a retrial of *Morse I* the admissibility of defendant's extrajudicial statements relating to that case will be governed by the standards set forth in *Miranda* v. *Arizona, supra,* 384 U.S. 436. (See *People* v. *Doherty* (1967) 67 Cal.2d 9 [59 Cal.Rptr. 857, 429 P.2d 177].) Similarly, *Miranda* standards will apply if said statements or any part thereof are sought to be introduced in the retrial of the *Morse II* penalty issue. In view of the possibility that the prosecution in the course of said penalty retrial may produce additional evidence relevant to an examination of the subject statements under *Miranda* standards, we here, as in *In re Morse,* do not undertake an application of such standards to the instant record.

B. At the penalty trial the prosecution sought to introduce into evidence the baseball bat allegedly used by defendant to kill his sister in 1962. In an attempt to lay a foundation for admission the prosecution elicited testimony from one of the officers involved in the 1962 investigation to the effect that the bat sought to be admitted was the bat found at the scene of the murders. Objection to admission on the basis of this foun-

[22]Defendant's statement in the police car was introduced in its entirety in *Morse I* and is set forth in *In re Morse, supra, ante,* at p. 705, fn. 4.

[23]"Q. [By the prosecutor.] Officer Roland, will you tell us, please, in relation to that last question and answer that you gave, what is your best memory of the exact words of the defendant, and the exact question? A. [By Officer Roland.] . . . Sergeant Pauline told him that when we got to the station he would give him a paper and pencil to make notes to refresh his memory, because they would probably ask him questions as to where he had been, and so forth. The defendant answered, 'I don't think that will help me. Prison won't do any good. It must have been something in my head.' Sergeant Pauline said, 'Do you mean to make you kill them?' And he answered, 'Yes.'"

dation was·properly sustained on the ground that there was no evidence to show that the bat had been used as a weapon·in the killings. In order to supply this element of the foundation the prosecutor sought to introduce a passage from the cross-examination of defendant in the *Morse I* trial. Strenuous objection was interposed by the defense attorney who argued, anticipating our decisions in *People* v. *Spencer* (1967) 66 Cal. 2d 158 [57 Cal.Rptr. 163, 424 P.2d 715], and *People* v. *Jackson* (1967) 67 Cal.2d 96 [60 Cal.Rptr. 248, 429 P.2d 600], that the whole of defendant's testimony was induced by and the product of the detailed and damaging confession given at the police station which had been earlier excluded by the court on *Escobedo-Dorado* grounds. The objection was overruled, and foundation testimony as to the bat was read into evidence as set forth in the footnote.[24] The baseball bat was thereupon admitted into evidence in the penalty phase of the instant case without further objection.

We have held today in *In re Morse, supra, ante,* p. 702, that the extrajudicial statement elicited from defendant at the Chula Vista police station following the killing of his mother and sister was erroneously admitted into evidence in the *Morse I* trial. ▮▮▮▮ In *People* v. *Jackson, supra,* 67 Cal.2d 96, 100, we held that testimony which is "a product of the admission" of statements obtained in violation of *Escobedo-Dorado* rights is infected with the error of such admission. (See also *Harrison* v. *United States* (1967) 392 U.S. 219 [20 L.Ed.2d 1047, 88 S.Ct. 2008].) Examining the record· in accordance with the standards set forth in *People* v. *Spencer, supra,* 66 Cal.2d 158, 163-169, we concluded in *Jackson* that prior testimony of defendant which was introduced in his second penalty trial was "a product of the admission" of illegally

---

[24]"Mr. STAHL [the prosecutor]: Your Honor, at this time I would offer, based on a stipulation with Mr. Rickles [defense attorney], that certain testimony was given by the defendant, Joseph Bernard Morse, at a former trial in San Diego, that took place between November 29 and December 12, 1962, . . .

" 'Q. [By the prosecutor.] Well, what about the baseball bat? Didn't you tell us just a minute ago that you hit your sister with the baseball bat? A. [By the defendant.] Yes. Q. Where did you get that? A. From the broom closet in the kitchen. Q. What did you—what made you go out to the kitchen to get that? A. I don't know, I just went and got it. Q. Who were you going to use it on, your mother or your sister? A. I really don't know that either. Q. You had no idea in your mind? A. No, sir. Q. Well, what did you do with it? A. I believe I hit my sister with it. Q. You went out to the broom closet in the kitchen, is that correct? A. Yes. Q. That's the closet that has been indicated on the diagram by the outline in blue? A. Yes. Q. And you got the baseball bat? A. Yes.' I have finished reading line 21 on page 518, your Honor."

obtained extrajudicial statements introduced in his first trial; that the admission of such testimony was therefore erroneous; that such error was not harmless beyond a reasonable doubt (*Chapman* v. *California, supra*, 386 U.S. 18, 24 [17 L..Ed.2d 705, 710]); and that the judgment imposing the death penalty must therefore be reversed. Although the testimony at issue in the instant case was originally given by defendant in the course of a trial for crimes different from that involved in the guilt phase herein, we do not consider that this fact renders the *Jackson* principle inapplicable. We therefore proceed to undertake the inquiry outlined therein.

In *Spencer* we indicated that, in cases wherein an inadmissible extrajudicial confession is followed by a testimonial confession, the latter confession must be considered to merge into the former, and therefore share in its inadmissibility unless the state bears its "burden of showing that the causative link between the two confessions had been broken." (66 Cal.2d at p. 168.) We further indicated, however, that the rationale in question was not limited to those cases wherein the testimonial statement constituted a *confession* at least as damning as the erroneously admitted extrajudicial confession, for we recognized that the devastating effect of such an extrajudicial confession upon the defense might evoke testimonial reactions ranging from outraged disavowal to abject contrition. We there observed: "Believing his confession admissible, defendant might have taken the stand in order to explain its most damaging features or to emphasize the extenuating circumstances surrounding his crime; or he might simply have concluded that the prosecution's use of his confession had rendered further resistance futile and had made it imperative that he appear as cooperative as possible." (66 Cal.2d at pp. 165-166). Thus, whether the testimonial statement "merges" with the extrajudicial confession because of a similar inculpatory nature, or whether it fails to so "merge" because it in effect contradicts the earlier statement, it is equally inadmissible in subsequent proceedings if the prosecution fails to demonstrate the lack of a "causative link" between the two statements. (See and compare *People* v. *Alesi* (1967) 67 Cal.2d 856, 862-863 [54 Cal.Rptr. 104, 434 P.2d 360].)

Moreover, as we also pointed out in *Spencer*, the prosecution cannot bear the burden cast upon it merely by showing that there was evidence other than the invalid extrajudicial confession which might have induced defendant to take the

748

stand and thereby waive his privilege of testimonial silence. (U.S. Const., Amend. V; Cal. Const., art. I, § 13.) "Although substantial evidence other than defendant's extrajudicial confession connected him with the crime, his case had been shattered by the 'evidentiary bombshell' of that confession. (See *People* v. *Schader, supra,* 62 Cal.2d 716, 731 [44 Cal.Rptr. 193, 401 P.2d 665]; *People* v. *Parham, supra,* 60 Cal.2d 378, 385 [33 Cal.Rptr. 497, 384 P.2d 1001].) In light of the overwhelming damage thereby inflicted by the prosecution, we must surely acknowledge at least a 'reasonable possibility' that the defendant took the stand in part because a confession which he erroneously believed admissible had completely demolished his prospects for a favorable verdict.'' (Fns. omitted.) (*People* v. *Spencer, supra,* 66 Cal.2d 158, 168-169.)[25]

It is therefore clear that, in cases wherein an extrajudicial confession has been introduced against the defendant erroneously and with prejudicial effect,[26] and he thereafter waives his privilege of testimonial silence by taking the stand in his own behalf, any testimonial statement made by him must be deemed "a product of the admission" of such confession (*People* v. *Jackson, supra,* 67 Cal.2d 96, 100), and is therefore inadmissible in any subsequent proceeding, unless the prosecution demonstrates the absence of any reasonable possibility that defendant was even in part induced to take the stand by the erroneous admission of such extrajudicial confession.

The prosecution failed to sustain its burden in the instant case. Its reference in the appeal before us to evidence in the *Morse I* record, other than the invalid extrajudicial confession, connecting defendant with the killings of his mother and sister is, as we have pointed out above, insufficient to dispel the reasonable possibility that defendant was at least in part impelled to take the stand in order to diminish the "bombshell" effect of that erroneously admitted confession.

[25] As the case of *People* v. *Alesi, supra,* 67 Cal.2d 856, 862-863, demonstrates, the prosecution can more easily bear its burden in cases wherein the erroneously admitted extrajudicial statements involved do not amount to a full confession of guilt with its concomitant devastating effect upon the defense.

[26] The admission of a constitutionally invalid extrajudicial confession which is merely cumulative of a prior valid confession also in evidence has no prejudicial effect upon the defendant and does not require reversal of the judgment. (*People* v. *Jacobson* (1965) 63 Cal.2d 319, 330-331 [46 Cal.Rptr. 515, 405 P.2d 555].) Similarly, such a cumulative confession, although erroneously admitted, cannot be considered a factor impelling defendant to take the stand.

It is apparent, for example, that a substantial portion of defendant's courtroom testimony in *Morse I* was designed to explain away that portion of the extrajudicial statement wherein defendant maintained that he was not under the influence of narcotics at the time of the killings. Similarly, we do not accept the argument that the presence in the *Morse I* record of defendant's first extrajudicial statement (that obtained in the police car enroute to the Chula Vista police station) was an independently sufficient inducement to cause defendant to take the stand. Even if we assume that the *whole*[27] of that statement was properly admissible in evidence, and that, as the Attorney General urges, it constituted "at the least a confession to second-degree murder," still we are unable to conclude that defendant's decision to take the stand in *Morse I* was not induced at least in part by the erroneous admission of the inflammatory second confession which, as pointed out above, constituted a dispassionate and detailed account of premeditated and deliberate murder.

We therefore conclude that defendant's courtroom testimony in *Morse I* was "a product of the admission" of his invalid extrajudicial confession (*People* v. *Jackson, supra,* 67 Cal.2d 96, 100), and that the admission of a portion of that testimony in the penalty phase of the instant case was erroneous.

If upon retrial of the penalty issue the prosecution seeks to introduce any portion of that testimony, it will be required to show that such testimony was not a product of the admission of illegally obtained extrajudicial confessions introduced in the *Morse I* trial. This, as we have indicated above, it cannot do unless it shows that the two extrajudicial confessions in question were properly in evidence in *Morse I*, the admissibility of such statements being measured by the standards set forth in *Miranda* v. *Arizona, supra,* 384 U.S. 436.

C. Defendant finally contends that all references in the penalty trial herein to the judgment in *Morse I*, which we have today vacated insofar as it relates to the murder counts (*In re Morse, supra, ante,* p. 702), constituted error. He points out that the prosecution's case as to penalty consisted almost entirely of testimony relating to the *Morse I* crimes;[28]

---

[27] In *In re Morse, supra, ante,* p. 702, we found it unnecessary to decide whether the whole of such statement was admissible at the trial in *Morse I*.

[28] The prosecution chose not to rely primarily on the *Morse I* trial transcript; instead it called to the stand witnesses who had testified in

·that the jury was made aware[29] that defendant had been convicted of two counts of first degree murder, had received the death penalty at his first *Morse I* penalty trial, and had been sentenced to life imprisonment on the murder counts after the second *Morse I* penalty trial; and that the burden of the prosecution's argument on the evidence consisted of an appeal to the jury that a man thrice convicted of brutal first degree murders should not be allowed to live. All of these references, defendant urges, were erroneous.

It is clear that the admission of testimony and argument relative to the *facts* upon which the *Morse I* judgment was based was not rendered improper per se by our determination today that the judgment must be reversed.　█　The fact that a prior judgment has been vacated because of constitutional error in the trial does not of itself render improper, in proceedings to determine the penalty to be imposed for a subsequently committed crime, an inquiry into the circumstances surrounding events which were the basis of that prior judgment. (Cf. *People* v. *Purvis* (1959) 52 Cal.2d 871, 881 [346 P.2d 22]; *People* v. *Griffin* (1963) 60 Cal.2d 182, 189-191 [32 Cal.Rptr. 24, 383 P.2d 432], reversed on other grounds in *Griffin* v. *California, supra,* 380 U.S. 609; *People* v. *Terry* (1964) 61 Cal.2d 137, 143 [37 Cal.Rptr. 605, 390 P.2d 381].) Of course such an inquiry must proceed in light of constitutional standards applicable at the time of such penalty determination, and evidence admitted in the prior trial which does not meet such present standards must be rejected. Upon retrial of the penalty issue the trial court will be governed accordingly.

█　In this regard, however, we must distinguish between the *facts* of the offense and the *conclusions* reached by judges and juries on the basis of those facts. As noted above, the jury in this case was made aware not only of the facts of the 1962 offenses, but also of the jury's verdicts as to guilt and punishment as well as the subsequent judicial history of the case. We have held today, however, that the judgment to which those references pertained was tainted by prejudicial error of constitutional dimension and must be reversed insofar as it relates to the murder counts. (*In re Morse, supra, ante,* p.

*Morse I* as well as other witnesses who were not then called but who were capable of giving direct evidence.

[29]The judgment itself was not introduced into evidence. However, the fact that defendant had admitted the murder convictions as charged in the *Morse II* indictment was before the jury.

702.) We do not believe that it would be consistent with defendant's rights to permit the prosecution to refer to the vacated portion of that judgment, or to the verdicts underlying it, when a new jury undertakes to determine the penalty to be suffered by defendant for the murder of Thomas Taddei. (Cf. *Burgett* v. *Texas* (1967) 389 U.S. 109 [19 L.Ed.2d 319, 88 S.Ct. 258].)

The judgment is reversed insofar as it relates to penalty; in all other respects the judgment is affirmed.

Tobriner, J., and Burke, J., concurred.

PETERS, J.—I agree with the majority opinion insofar as it holds that the penalty judgment must be reversed, but I dissent from the affirmance of the guilt judgment. In my opinion, that too, must be reversed.

The majority opinion fairly sets forth the facts. That opinion concedes that two major errors occurred during the guilt trial. (1) In violation of the rules announced in *Griffin* v. *California,* 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229], the district attorney commented and the trial court instructed as to the inferences permissible because defendant did not take the stand, and (2) statements of defendant were introduced through the testimony of the psychiatrist, Dr. Haynes, and the trial court failed to give the limiting instruction required by *In re Spencer,* 63 Cal.2d 400, 412 [46 Cal.Rptr. 753, 406 P.2d 33]. The majority hold that these two admitted errors were nonprejudicial under the test announced in *Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]. I cannot agree. Within the ambit of that case I think there is far more than a "reasonable possibility" that such errors could have affected the verdict. They, therefore. required reversal.

In addition, contrary to the majority, I believe it was error of a most serious and prejudicial nature not to instruct on manslaughter. These errors, considered singly or collectively, were most prejudicial.

We are here, of course, concerned with federal constitutional error, and it is most important to define just what the impact of the errors was. The majority emphasize, correctly, that the record independently shows that defendant is "guilty," in that it appears that he killed Mr. Taddei. The majority then attempt to appraise the prejudicial effect of the errors against this incontrovertible fact. But the fact that defendant killed Taddei is irrelevant to the main issue.

Defendant was found guilty of first degree murder. His defense was not that he had not killed, but that he killed under circumstances not warranting the finding of first degree. The issue involved is not whether defendant killed Taddei, but whether the killing was first degree or a lesser degree. While the errors involved could not have possibly affected the determination that defendant killed Taddei, in my opinion there is a strong probability that they affected the degree of the verdict. This brings the case within the ambit of *Chapman*.

The federal test of prejudicial error was announced in *Fahy* v. *Connecticut*, 375 U.S. 85, 86-87 [11 L.Ed.2d 171, 173, 84 S.Ct. 229], to be that an error is prejudicial unless there is no ''reasonable possibility'' that the error ''might have contributed to the conviction.'' This rule was quoted with approval in *Chapman* v. *California, supra*, 386 U.S. 18 and then the court stated: (p. 24 [17 L.Ed.2d pp. 710-711]) ''. . . before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.'' In other words, to warrant a reversal, the defendant does not have to demonstrate that there is a reasonable possibility that the errors did affect the verdict but only that there is a reasonable possibility, that the errors ''might'' have contributed to the verdict. Stated even another way, once federal error is established, a reversal follows as of course unless the appellate court can find that there is no reasonable possibility that the error might have contributed to the verdict. The majority purport to follow the rule of the *Chapman* case, but, in my opinion, only give lip service to it. The ''reasoning'' by which they arrive at the conclusion that the admitted errors might not have affected the verdict of first degree murder is clearly wrong.

First, let us consider the *Griffin* error in connection with the degree of the crime fixed by the jury. Admittedly the district attorney erroneously commented on the failure of defendant to take the stand. The comment does not stand alone. There were also instructions on the subject. Even if the comment should be limited so as not to be prejudicial, the instructions on this issue cannot be so limited. They were unlimited in scope. They told the jury in no uncertain terms that the failure of defendant to take the stand on any and all the issues involved was subject to the adverse inferences. Defendant's main defense was that he was incapable of committing first degree murder because he was unable to and did not premeditate the

crime in that he was acting instinctively and as an automaton. This has been testified to by the defense psychiatrist. The instructions here under attack struck that defense with shattering impact. They clearly told the jury in no uncertain terms that because defendant did not take the stand to corroborate his psychiatrist the jury could and should indulge in adverse inferences against him, i.e., that they should infer the psychiatrist was not telling the truth. The instructions were much broader than the comment. These were the very instructions, word for word, that are held to be erroneous and prejudicial in *Griffin*. They shattered defendant's entire defense. If the instructions were prejudicial in *Griffin* they were also prejudicial here.

The second error was equally devastating. Dr. Haynes was called to rebut the defense psychiatrist, Dr. Wilson. The latter had testified that defendant had not premeditated the murder, but had acted instinctively in response to certain stimuli. Dr. Haynes was permitted to testify that defendant had told him that he had prepared the rope used to garrot Taddei the night before the murder. That evidence completely destroyed the defense of lack of premeditation. This evidence, under certain limitations, would have been admissible, but the majority are forced to concede that under the rule announced in *In re Spencer, supra,* 63 Cal.2d 400, the eliciting of such information, even where defendant has placed his mental condition in issue, is erroneous unless the jury is given the limiting instruction that such statements are not admitted for their truth but only to show the basis of the psychiatrist's opinion. No such limiting instruction was here given. Without it the jury was permitted to use the statements of Morse as testified to by Dr. Haynes to conclude that Morse had planned the crime for at least a day. If the jury did so believe Dr. Haynes' testimony, it completely repudiated Morse's chief line of defense. To say that that error might not have affected the verdict of first degree murder is to challenge reality.

The majority hold that it was not error for the trial court to refuse proffered instructions on manslaughter. They point out that the court gave detailed instructions on diminished responsibility insofar as second degree murder was concerned, but contend that under the evidence defendant was not entitled to the manslaughter instructions. They reach that conclusion by the assertion that the evidence of lack of premeditation, although it required instructions on reduced responsibility (which were given), did not show lack of malice and without

such showing no instruction on manslaughter was required.

Of course, the issue is whether there is any evidence of lack of malice, or any evidence from which lack of malice may be inferred. If there was, no matter how *"incredible the testimony of a defendant may be he is entitled to an instruction based upon the hypothesis that it is entirely true"* (emphasis in original) (*People* v. *Carmen,* 36 Cal.2d 768, 773 [228 P.2d 281] ; *People* v. *Wilson,* 66 Cal.2d 749, 762 [59 Cal.Rptr. 156, 427 P.2d 820] ; *People* v. *Modesto,* 59 Cal.2d 722, 729 [31 Cal. Rptr. 225, 382 P.2d 33] ; *People* v. *Bridgehouse,* 47 Cal.2d 406 [303 P.2d 1018]).

Whether there is any evidence of lack of malice depends entirely upon the testimony of Dr. Wilson. That evidence is sufficiently set forth in the majority opinion in footnote 15. Much of it obviously concerns defendant's capacity for premeditation and does not directly relate to malice aforethought. However, insofar as that testimony relates to provocation, the evidence does relate to the issue of malice. Not only does Dr. Wilson's testimony show that defendant was incapable of premeditation and deliberation, but it also shows that he was unable to harbor the state of mind called malice aforethought. Dr. Wilson testified that defendant suffers from a medically recognized character disorder known as sociopathic personality, antisocial type. One of the factors in this kind of mental disorder is that it renders the subject incapable of relating to the world outside himself in terms of social morality so that 'he becomes a law unto himself. Superimposed on this character disorder of defendant is the effect of the custodial environment in which defendant has spent most of his life. Such an environment tends to exaggerate the value of practical comforts and to cause the defendant to believe that direct retaliation is the acceptable method of meeting personal affronts. Within this context of personality disorder, as affected by the custodial environment, defendant was provoked by Taddei's conduct in reneging on an act, failing to live up to his promise to turn over desserts, and trying to buy a cigarette, and that defendant's retaliation was consistent and psychologically predictable. Once the stimuli occurred defendant had no control over the following events because his actions were instinctive, i.e., those of an automaton.

While most of this evidence relates to premeditation it also relates to malice aforethought.

The majority reason that the only way that malice afore-

thought may be negated by proof of mental illness not amounting to legal insanity is by evidence that the defendant " 'is unable to comprehend his duty to govern his actions in accord with the duty imposed by law.' " The majority rely upon *People* v. *Conley,* 64 Cal.2d 310, 322 [49 Cal.Rptr. 815, 411 P.2d 911], for this rule, but in *Conley* the court merely sets forth the quoted matter as one of the ways in which malice aforethought may be negated by evidence of mental illness and does not state that it is the exclusive way. When the statement is read in context, it is clear that this part of the *Conley* opinion is not directed toward an exhaustive discussion of the manner in which the implication of malice aforethought may be negated by evidence of mental illness and is directed only to those situations where a jury, accepting the evidence of mental illness, might find that the evidence of mental illness negates malice aforethought but does not negative premeditation. In other words, this part of the opinion was not concerned with mental illness which might negate both malice aforethought and premeditation but only situations where the evidence of mental illness would not negate the existence of premeditation but would negate, if believed, the existence of malice aforethought.

In any event, even if it be assumed that the rule quoted from *Conley* sets forth the exclusive manner by which evidence of mental illness may negate malice aforethought, the evidence in the instant case is sufficient to warrant a finding that defendant acted without malice aforethought. Immediately after stating the rule relied upon by the majority herein, the opinion in *Conley* continues: "The situation of an individual who kills with intent, deliberation, and premeditation, but without malice aforethought is illustrated by the evidence in the *Gorshen* case. Had the trial court in that case believed the defendant's testimony, it might have concluded that he acted without malice when, after an altercation with his foreman and after consuming a large quantity of alcohol, he went to his home, got his pistol, fired a shot in his living room, drove back to his place of employment, and then after being searched by two police officers (who did not find his gun) and while still in their company shot the foreman. The psychiatric expert urged that because of personality disintegration and paranoic schizophrenia the defendant believed the act necessary to prevent his own insanity and that the defendant was incapable of having the 'mental state which is required for malice aforethought, or premeditation or any-

thing which implies intention, deliberation, or premeditation.' (*People* v. *Gorshen, supra,* 51 Cal.2d 716, 723 [336 P.2d 492].) The defendant had testified that he had forgotten about 'God's laws and human's laws and everything else.' (*Id.*) Confronted with this evidence, the court or a jury could conclude that the defendant killed intentionally, with premeditation and deliberation, but did not do so with malice aforethought. Although legally sane according to the M'Naughton test, such a defendant could not be convicted of murder if mental illness prevented his acting with malice aforethought. (*People* v. *Wolff,* 61 Cal.2d 795, 819 [40 Cal.Rptr. 271, 394 P.2d 959] ; *People* v. *Henderson, supra,* 60 Cal.2d 482, 490 [35 Cal.Rptr. 77, 386 P.2d 667].)'' (*People* v. *Conley, supra,* 64 Cal.2d at pp. 322-323.)

This language makes it abundantly clear that mental illness short of legal insanity may negate malice aforethought even though the defendant does not believe his conduct is proper, and that the phrase used in *Conley* and relied upon by the majority, ''the defendant is unable to comprehend his duty to govern his actions in accord with the duty imposed by law,'' does not mean that mental illness short of legal insanity which negates malice aforethought is limited to illness which causes the defendant to believe his conduct to be lawful but means that malice aforethought may be negated by a showing that the mental illness precluded the defendant from awareness that his conduct was unlawful. In *Gorshen,* the defendant said he had ''forgot about God's laws and human's laws and everything else;'' he did not say that he believed that his conduct was lawful.

Indeed, until I read the majority opinion, I believed the matter had been settled by *Gorshen,* which involved a conviction of second degree murder, thus an acquittal of first, and which squarely held that the defense of irresistible impulse was applicable not as a complete defense but as rebutting malice aforethought. The court in the first issue discussed said: ''Dr. Diamond's testimony was properly received in accord with the holding of *People* v. *Wells* (1949), 33 Cal.2d 330, 346-357 [202 P.2d 53], that on the trial of the issues raised by a plea of not guilty to a charge of a crime which requires proof of a specific mental state, competent evidence that because of mental abnormality not amounting to legal insanity defendant did not possess the essential specific mental state is admissible. The admission of testimony such as that of the expert here, for the purpose of consideration by the

trier of fact upon issues of particular essential mental state, does not, as it has been suggested, imply acceptance (on the general issue) of the defense of irresistible impulse (which is rejected in this state as a test of the defense of legal insanity; see 25 Cal.Jur.2d, Homicide, § 254; 14 Cal.Jur.2d, Criminal Law, § 218) nor does it imply rejection of the criminal law's postulate of free will. It has been said (in *People* v. *Hoin* (1882), 62 Cal. 120, 123 [45 Am.Rep. 651]) that 'Whatever may be the abstract truth, the law has never recognized an impulse as uncontrollable which yet leaves the reasoning powers—including the capacity to appreciate the nature and quality of the particular act—unaffected by mental disease.' (See also *People* v. *Stein* (1918), 23 Cal.App. 108, 115-116 [137 P. 271].) But this statement must be considered in its context; it was made in the course of an opinion which holds that irresistible impulse does not constitute the insanity which is a complete defense; i.e., which is exculpatory of all penal responsibility for any otherwise criminal act. So considered, statements such as that quoted from the Hoin case do not preclude the admission and consideration, on the issue of specific intent or other particular mental state, of expert testimony which includes such concepts as the uncontrollable compulsion described by the expert here (described, it may be added, not as an 'abstract truth' but as arising upon the specific facts, objective and subjective, of this particular killing)." (Footnote omitted.) (*People* v. *Gorshen, supra*, 51 Cal.2d 716, 726-727.)

In this regard, it should also be pointed out that even proof of legal insanity does not require that it be shown that the defendant labored under a delusion which made him believe that his conduct was proper. Under the familiar M'Naughton rule the test is "that at the time defendant committed the act, he was laboring under such a defect of reason, from disease of the mind, that he did not know the nature and quality of his act *or, if he did know it, that he did not know that he was doing what was wrong."* (Italics added.) (*People* v. *Gorshen, supra*, 51 Cal.2d 716, 726, fn. 5.) Certainly, no greater burden with regard to the issue of awareness of the wrongful nature of conduct should be applied to establish the partial defense of diminished responsibility due to mental illness. In the instant case Dr. Wilson testified, as recognized in footnote 15 of the majority opinion, that, because of his mental condition defendant does not "have the capacity to think in terms of usual values of morality. He is without the ability,

in other words, to think in moral terms. In other words, taking of a life can be justified on many means. We think of it as being the supreme sort of act. To a person of this sort, it is just another act, and it can follow as a result of many things, even something minor such as this.''

The doctor further testified: ''Once the act began, his actions were those of an instinctual nature. . . . Instinct. In other words, there was an automatic response. Given the circumstances and the precipitating factors, he then acted without any particular thought. It was merely the appropriate thing to do, and no thought was given to the act. The act merely took place as a matter of course. . . .''

A conclusion that there is no evidence negating malice aforethought in the present case can only be reached by ignoring *Gorshen,* and the discussion of *Gorshen* in *Conley,* and thereby impliedly overruling those cases or by ignoring the testimony of Dr. Wilson in the instant case. The evidence in this case is as strong as that in *Gorshen.* In both cases the defendant, according to the psychiatric testimony, was incapable because of his mental condition of governing his conduct in accord with the duty imposed by law. The fact that the defendant in *Gorshen* said he forgot the law adds nothing other than corroboration to the expert testimony in *Gorshen,* similar to the expert testimony presented here, that due to his mental condition the defendant in the circumstances existing was incapable of acting in accord with the duty imposed by law. Accordingly, I am satisfied that the evidence of Dr. Wilson under the settled rules of law was sufficient to negate the existence of malice aforethought and that the court erred in refusing to give the requested instructions on manslaughter. The denial of the right to have a significant issue determined by the jury is in itself a miscarriage of justice, and reversal is required because the defendant has a constitutional right to have the jury determine every material issue presented by the evidence. (*People* v. *Conley, supra,* 64 Cal.2d 310, 319-320; *People* v. *Modesto, supra,* 59 Cal.2d 722, 730.)

I would reverse both the guilt and penalty judgments.

TRAYNOR, J.—I concur in the reversal of the judgment on the issue of penalty. I would also reverse the judgment on the issue of guilt under the compulsion of *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229], and *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705,

87 S.Ct. 824]. (See also *Ross* v. *California* (1968) 391 U.S. 470 [20 L.Ed.2d 750, 88 S.Ct. 1850].)

McCOMB, J., Concurring and Dissenting.—I dissent from the reversal of the judgment imposing the death penalty for the reason that, in my opinion, the error complained of did not result in a miscarriage of justice. (Cal. Const., art. VI, § 13.)

Appellant's petition for a rehearing was denied May 8, 1969. Mosk, J., did not participate therein. Traynor, C. J., and Peters, J., were of the opinion that the petition should be granted.