[Crim. No. 6473. Fourth Dist., Div. Two. Nov. 7, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
WESLEY GARDNER SLOCUM, Defendant and Appellant.

## COUNSEL

Schnider & Schnider and Robert Schnider for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Alan S. Meth and Steven V. Adler, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KERRIGAN, J.**—In August 1972, Nancy Fenno informed state officials that her employer and paramour, Wesley Gardner Slocum, physician and surgeon, was defrauding the State of California of thousands of dollars by presenting false Medi-Cal claims. The government launched an extensive, ongoing investigation into the charges and Slocum became aware of it but apparently never suspected that his girl friend (who worked as a nurse-receptionist in his office) was the informant.

In March 1973, he was indicted. In September, his trial commenced. During the first six to seven weeks of the trial (October-November) Nancy and the defendant occupied a house in Riverside. But on November 26 she was called as a prosecution witness.

Following a six-month trial, Slocum was convicted by a jury of one count of grand theft (Pen. Code, §§ 484-487) and twenty-two counts of submitting a false claim (Pen. Code, § 72) and was thereafter sentenced to state prison.

Prior to trial, Slocum made a motion for change of venue and it was denied; his demurrer to the indictment was overruled; his motion to suppress evidence seized at his residence was denied; and his motion to set aside the indictment was likewise denied.

During trial, defendant made several motions for a mistrial. The motions were based on the premise that he could not obtain a fair trial in

that three to four incidents had occurred in which the empaneled jurors had been apprised of the fact that he had been charged in March 1970 with the murder of his infant daughter. The motions were denied.

Following the rendition of the verdict, Slocum's motion to reduce all counts to misdemeanors (Pen. Code, § 17) was denied. His application for probation and his motion for a new trial were similarly denied.

Slocum raises 10 issues on appeal. Several involve the trial court's rulings on jury instructions, objections and the admission of evidence. Each will be categorically considered. However, his main points follow: (1) his paramour's role in the prosecution worked to his constitutional disadvantage in that she was present at confidential pretrial and trial conferences between him and his attorney; (2) a mistrial should have been granted; (3) illegally seized evidence was improperly admitted; and (4) the grand theft felony conviction cannot stand as the amount of each false claim was less than $200, a misdemeanor at most.

We have determined that the defendant's Fourth, Sixth and Fourteenth Amendment rights were not violated; that he was properly charged and sentenced; and that the court's rulings were correct.

## FACTS

Slocum received his medical degree in 1952, moved to California and engaged in a general practice in Santa Ana. Eventually, 80 percent of his practice involved patients who were recipients of some form of government aid such as Medi-Care or Medi-Cal.

The Medi-Cal program provides medical assistance at state expense for needy persons. The state administers the program through Blue Shield, a private, nonprofit corporation which receives and pays Medi-Cal claims upon behalf of the state.

Each Medi-Cal beneficiary receives an identification card every month for use in the succeeding month. The I.D. card contains the recipient's name and address, I.D. number, date of birth and sex; affixed to each I.D. card is a series of 10 separate "peel-off" labels or stamps: two "MEDI" labels (covering such services as visits to a physician's, optometrist's, psychiatrist's or psychologist's office); two "DRUG" labels (prescriptions); and six "PROOF OF ELIGIBILITY" (POE) labels (covering major medical care and equipment such as hospitalization, lab

services and prostheses; however, Blue Shield must ordinarily be contacted in advance and authorize such care, treatment and equipment before the POE stamps will be honored). Only the person named on the I.D. card may utilize the card or labels; in other words, the card and stamps are nontransferable.[1]

In a typical situation where the patient ("recipient") requires drugs or treatment, he simply visits his doctor or pharmacist ("provider") and presents the I.D. card with the labels attached. The provider removes a label and furnishes the treatment or prescription required. The provider prepares a claim form containing the following information: his name and address; beneficiary's name and I.D. number; date of service; service rendered; and the amount of the fee. The stamp removed from the recipient's I.D. card is attached to the claim and transmitted to Blue Shield. Through the use of manpower and computers, Blue Shield figures the amount allowed under the program and orders a draft sent to the provider.

Defendant had his own unique method of providing services. Generally, he took all the I.D. cards (with the labels attached) from a family. In return, he provided whatever medical care the family needed that month. The stamps were taken as a matter of regular office practice, not only when treatment was rendered but when it was not. Each month he billed Blue Shield whether treatment was rendered or not. Stated succinctly, the treatment rendered and the bills presented rarely coincided.

Generally, when a patient entered defendant's office, an employee would take the name and other basic information to be recorded on the Medi-Cal claim form. The employee would then affix a stamp to the claim. The form and label were turned over to the defendant. Defendant usually took the forms home with him and wrote out the diagnosis and treatment purportedly rendered. Defendant would use whatever stamps were necessary to complete the form, no matter which member of the family he had treated. The completed claim forms were submitted to Blue Shield and the checks defendant received were either endorsed by

---

[1]California Administrative Code, title 22, section 51486, which went into effect on October 1, 1971, provides as follows:

"Medi-Cal Card Labels. (a) No provider shall remove more labels from a Medi-Cal card than are necessary to submit a claim for reimbursement for each service, drug, or item provided.

"(b) No provider shall remove any label from a Medi-Cal card to bill for any service provided to any person other than the beneficiary identified on such card."

him or by one of his staff. Over the years defendant filed a vast number of Medi-Cal claims: for example, in 1972, he filed over 5,000 claims for which he was paid $182,000.

During the course of the long trial, a formidable mass of evidence was presented indicating that between September 1971-July 1972 Slocum filed numerous false claims for services he never rendered and also defrauded the state by billing Blue Shield for services rendered to one member of a family for which he had used another member's stamp. An array of defendant's patients testified that they did not receive the treatments for which defendant billed the state. The physical evidence was also devastating: over 300 false claim forms were introduced reflecting a total theft of state funds ranging between $5,000-$9,000.

Nancy Fenno was deeply involved in the fraud upon the government. Her relationship with defendant was both professional and romantic. By July 1971 she had completed much of her training towards becoming a registered nurse and was employed in the dual capacity of nurse and part-time receptionist. She assisted defendant in preparing and submitting the false claims and endorsed many of Blue Shield's checks.

However, in May 1972 she began to doubt the sincerity of his promises to marry her and while their personal relationship deteriorated somewhat thereafter, defendant continued to confide in her. Then in August 1972, Nancy reported defendant to Medi-Cal.

Medi-Cal commenced an investigation. A computer printout was ordered of all of defendant's billings and his patients were interviewed. During the course of the investigation, defendant never dreamed that Nancy had informed on him. In any event, they continued to see each other after the indictment was issued. However, he warned her to "keep her goddamn mouth shut" and not to give the authorities any handwriting exemplars.

Slocum's defense took the following form: (1) he personally never submitted a claim for which no service was rendered; (2) while he had billed the state for services provided to one member of a family and used another member's stamp, it was customary for Orange County physicians to use the stamps of one member of the family to pay for treatment rendered to another member of the same family; and (3) Nancy was a woman scorned: a lying, vindictive, jealous female who turned on him because he spurned her affections and refused to marry her; the false

claims were possibly filed by her and she pocketed the proceeds received by endorsing his name on the checks.

## SEIZURE OF RECORDS

■ Defendant initially maintains that certain records (including Medi-Cal claim forms) that were seized from his person and residence at the time of his arrest should have been suppressed inasmuch as the seizure resulted from an illegal detention and was accomplished without a warrant, probable cause or consent.

Preliminarily, it should be noted that defendant's person was not searched at any time and the officers testified they did not search him; the officers' version must therefore be accepted at this level. (*People* v. *Hill,* 12 Cal.3d 731, 744 [117 Cal.Rptr. 393, 528 P.2d 1].) Consequently, only the residence search need be reviewed.

About 3:30 p.m. on December 15, 1972, two officers were dispatched to defendant's residence after being advised that the district attorney's office was in the process of obtaining a search warrant and there was reason to believe that the records which were the object of the warrant would be removed or destroyed during the time the warrant was being obtained; the officers were instructed they were to maintain surveillance and not allow any files or documents to leave the house; however, they were directed to neither detain nor arrest the defendant should he try to leave; shortly after their arrival, the officers observed the defendant as he prepared to leave in a cab; he was carrying an 8- x 10-inch manila envelope which the officers felt might contain records; they approached the cab and detained the defendant; defendant was asked whether he was carrying a gun; he responded, "No, you can come into my house;" defendant then entered the house with the officers; representatives of the district attorney's office were contacted and arrived at the defendant's residence between 4:30-5 p.m.; defendant was informed that he was free to go any time he wanted but his records could not be removed; the officers remained in the residence while the affidavit was being prepared and the warrant obtained; the warrant was issued about 6:50 p.m. and the search commenced at 7:20 p.m.; one of the items seized was a footlocker filled with unsigned Medi-Cal forms which had the patient's name and sticker on them but which had not as yet been completed.

■ Absent probable cause to arrest, consent to search or exigent circumstances, a search and seizure without a warrant is in violation of

the Fourth Amendment; the accused makes a prima facie showing that the search is unlawful when he shows it was not made pursuant to a search warrant. (*People* v. *Johnson,* 68 Cal.2d 629, 632 [68 Cal.Rptr. 441, 440 P.2d 921].) Evidence obtained as a result of an illegal search is inadmissible in a criminal prosecution (*Mapp* v. *Ohio,* 367 U.S. 643, 655 [6 L.Ed.2d 1081, 1090, 81 S.Ct. 1684, 1691, 84 A.L.R.2d 933]; *People* v. *Cahan,* 44 Cal.2d 434, 445 [282 P.2d 905, 50 A.L.R.2d 513]) and must be suppressed from admission into evidence.

■ The two Santa Ana detectives had cause to detain Slocum. They knew he was suspected of criminal activity and that a search warrant was being requested. They had been ordered not to permit him to remove any records pending arrival of the warrant and he was carrying an envelope. ■ A detention for reasonable investigative procedures infringes no constitutional right. (*People* v. *Harris,* 15 Cal.3d 384 [124 Cal.Rptr. 536, 540 P.2d 632]; *People* v. *Mickelson,* 59 Cal.2d 448, 450, 452 [30 Cal.Rptr. 18, 380 P.2d 658].)

■ However, the record is entirely inadequate as to what transpired after Slocum was detained and invited the officers inside. At the motion to suppress hearing, the trial court considered (pursuant to stipulation) a transcript of the municipal court hearing on the motion to quash the warrant. Similarly, an affidavit in support of the search warrant was also admitted into evidence at the hearing on the motion to suppress. Neither the transcript nor the affidavit is a part of the record herein. ■ It is well-settled that an appellate court, reviewing a trial court judgment on direct appeal, is limited to a consideration of matters contained in the trial proceedings. (*People* v. *Merriam,* 66 Cal.2d 390, 397 [58 Cal.Rptr. 1, 426 P.2d 161]; *People* v. *Doebke,* 1 Cal.App.3d 931, 938 [81 Cal.Rptr. 391]; *People* v. *Dabney,* 250 Cal.App.2d 933, 947 [59 Cal.Rptr. 243].) ■ Slocum has the burden of providing a complete record upon which to base his appeal. Slocum has failed to furnish us with a full record.

Next, probable cause to arrest Slocum could have been established if the prosecution had been required to present evidence in connection with the issue. Where probable cause to arrest exists and there is danger that incriminating records may be destroyed pending arrival of the warrant, officers are justified in securing the premises under the emergency doctrine. (*People* v. *Freeny,* 37 Cal.App.3d 20, 32-34 [112 Cal.Rptr. 33]; *Ferdin* v. *Superior Court,* 36 Cal.App.3d 774, 781-782 [112 Cal.Rptr. 66].) The officers had been directed not to permit any

documents to be removed from the home and Slocum was carrying an envelope as he started to leave. But defense counsel conceded, both below and on appeal, that the issue of probable cause to arrest was irrelevant. The People maintained throughout that probable cause existed.

Implicit in the order denying defendant's motion to suppress is a finding of all facts supported by substantial evidence which are essential to support the order. (*People* v. *Superior Court (Peck)* 10 Cal.3d 645, 649 [111 Cal.Rptr. 565, 517 P.2d 829]; *People* v. *Freund,* 48 Cal.App.3d 49, 54 [119 Cal.Rptr. 762].) Consequently, the trial court may well have concluded there was probable cause to arrest Slocum and that the officers acted reasonably in securing his residence pending arrival of the warrant.

### Attorney-Client Privilege Violated

Defendant was indicted in March 1973. The trial commenced in late September. Nancy Fenno took the stand as a prosecution witness on November 26. Between the time of the indictment and the time Nancy took the stand, defendant maintained a close personal relationship with her. He now argues that on several occasions she attended meetings between him and his trial counsel; that on other occasions she acted as the contact between him and his attorney; *ergo,* he was denied a fair trial because the prosecution deliberately exploited his confidential relationship with his attorney by acquiring knowledge of defense strategy through an informant.

While a defendant must assume the risk that his confidante may be a government informer (see *Hoffa* v. *United States,* 385 U.S. 293 [17 L.Ed.2d 374, 87 S.Ct. 408]; *Lopez* v. *United States,* 373 U.S. 427 [10 L.Ed.2d 462, 83 S.Ct. 1381]), he may suffer a denial of his Sixth Amendment right to counsel if the prosecution exploits the confidential attorney-client relationship its informer has established with the defendant and defense counsel. (*Caldwell* v. *United States* (1953 D.C.Cir.) 205 F.2d 879, 881 [92 App.D.C. 355].)

But Slocum's contention is entirely grounded upon conjecture and speculation. He failed to raise the issue below. No objection was interposed based on this ground to the testimony propounded by Nancy Fenno during the prosecution's case-in-chief. Nor did defendant move to strike Fenno's testimony at the close of the prosecution's case. At the

time of the hearing on the motion for a new trial, there was no mention of interference with the attorney-client relationship because of Nancy Fenno's close contact with the defendant during the early stages of the trial.

It is thus clear that defendant has waived any right to advance the present argument at this late stage. The trial court would have enjoyed a unique opportunity to inquire into the instant contention inasmuch as all parties were present and could have testified as to whether Nancy supplied the district attorney with any information regarding defense strategy. Specifically, Nancy and the prosecutor could have been interrogated in order to ascertain if she had revealed any details of defense preparation to the prosecution. Defendant and his counsel could have been examined to determine precisely what discussions had occurred in Fenno's presence. In short, the extraordinary hearing held in *Caldwell* v. *United States, supra,* 205 F.2d 879, 880, could have been held in this case. We would then be outside the realm of conjecture that presently prevails.

It is a well-settled rule of appellate procedure that matters not presented to the trial court may not, with certain exceptions not here applicable, be advanced for the first time on appeal. (*People* v. *Robinson,* 266 Cal.App.2d 261, 264 [72 Cal.Rptr. 33]; *People* v. *Murray,* 247 Cal.App.2d 730, 733 [56 Cal.Rptr. 21]; *People* v. *Roberts,* 197 Cal.App.2d 354, 361 [17 Cal.Rptr. 162]; 19 Cal.Jur.3d, Criminal Law (1975) § 1337, pp. 575-576.) Given the present state of the record, there is absolutely no evidence of any communication between Nancy Fenno and the prosecution, other than her testimony on the witness stand. In particular, there is no evidence whatsoever that details of defense preparation or strategy were revealed to the prosecution by Fenno as a result of her relationship with defendant.

The cases relied upon by defendant (*State* v. *Cory,* 62 Wn.2d 371 [382 P.2d 1019, 5 A.L.R.3d 1352]; *Caldwell* v. *United States, supra,* 205 F.2d 879) are readily distinguishable from this one.

In *Cory,* the sheriff's department electronically eavesdropped upon the room in which the defendant was consulting with his attorney concerning his case. Such is clearly not the situation here.

In *Caldwell,* the prosecutor "planted" an informant on the defendant and the informant gave continuing reports to the prosecution on

defendant's trial strategy in preparation for the case; evidence of the government's tactics was brought to light in a special hearing held by the trial court to determine the extent and effect of the informant's relationship with Caldwell; not only was prejudice clearly present, but there was some factual basis on which the appellate court could rule.

Both prejudice and such a factual basis are absent in the present case; hence, Slocum's argument must be rejected.

## MISTRIAL

■■■ Defendant maintains that he was denied a fair trial inasmuch as three to four incidents occurred wherein the jurors were informed that he had been previously tried for (and acquitted of) the murder of his infant daughter.

The first reference to the prior matter occurred at the outset of the trial. Ms. Di Leo went to work one day; one of her supervisors asked her if she was going to be a juror in the Slocum trial; she indicated that she was but could not discuss the matter; shortly thereafter the supervisor said: "Well, that Slocum trial is probably going to last a couple months. I thought that would be the case she was on but that jury is not going to be able to find him guilty because they couldn't even find him guilty when he killed his kid." Ms. Di Leo was upset by the incident and informed the court what had happened. An *in camera* hearing was held and both sides stipulated that Ms. Di Leo could remain as a member of the panel.

About a month later, a second juror (Humphrey) was approached by a spectator (Holmes). Holmes asked, "What is this case all about? Is it about—somebody killing or murdering their daughter or something like that. . . . ;" Humphrey did not reply but just walked on. This matter was reported to the court and counsel.

The next day another spectator (Denton) caused a disturbance inside the courtroom. While a prosecution witness was on the stand, he blurted something to the effect that "They let him get away with murdering his daughter, they'll probably let him get away with this, too." While many of the jurors did not hear the remark, those who did felt they would be able to continue to act without being influenced by the statement.

Following the Holmes and Denton incidents, the court conducted a further hearing and offered to replace Humphrey with an alternate. Both sides agreed Humphrey could remain on the panel.

After the trial had been in progress about six to seven weeks (about November 14), a final incident took place. An unfriendly prosecution witness (Brenda Joyce Lacy, age 16 years) was on the stand and attempting to explain inconsistencies between her testimony at trial and that given before the grand jury. In answer to a question by the district attorney as to one of the variances in her testimony, she replied, "I don't see how I could have said, 'No,' to all of those things because I have been going to Dr. Slocum ever since before he was tried for his daughter's murder." Defense counsel promptly moved for a mistrial. The trial judge sternly admonished the jury to disregard her remarks. Once again the court conducted a hearing: seven jurors indicated they had heard Ms. Lacy's statement; two jurors stated they had not heard the statement; the remaining jurors (and alternates) either heard part of the statement or were uncertain as to what the girl had said. All felt they would not be influenced by the witness' statement and that they could perform their function impartially. The motion for a mistrial was ultimately denied.

The trial judge is under a duty to preserve order in his courtroom. (*People* v. *Santo,* 43 Cal.2d 319, 331 [273 P.2d 249]; *People* v. *Fusaro,* 18 Cal.App.3d 877, 887-888 [96 Cal.Rptr. 368].) This includes the responsibility to guard against outbursts by the defendant or others, or any conduct calculated to obstruct justice. (*People* v. *Merkouris,* 46 Cal.2d 540, 556 [297 P.2d 999]; 18 Cal.Jur.3d, Criminal Law (1975) § 800, p. 479.) He is required to see that the accused receives a fair and impartial trial as guaranteed by the state and federal Constitutions. (*Kirstowsky* v. *Superior Court,* 143 Cal.App.2d 745, 753 [300 P.2d 163].)

Although the court cannot control public sentiment about the merits of the cause on trial, it is essential that it not allow that sentiment to be expressed in the presence of the jurors in such a manner as to influence their action. (*People* v. *Fleming,* 166 Cal. 357, 377 [136 P. 291].) However, the mere fact that a spectator is guilty of some misconduct during the trial does not mandate the declaration of a mistrial, where such misconduct is not so reprehensible as necessarily to result in influencing the jury, and especially where the judge takes immediate action to avert possible juror prejudice. (*People* v. *Gomez,* 252 Cal.App.2d 844, 854-855 [60 Cal.Rptr. 881], overruled on another ground in *People* v. *Tribble,* 4 Cal.3d 826, 832 [94 Cal.Rptr. 613, 484 P.2d 589]; *Foster* v. *State* (Tex. Crim.) 400 S.W.2d 552, 556; *State* v. *Wimby,* 119 La. 139 [43 So. 984, 985]; 75 Am.Jur.2d, Trial (1974) §§ 40-41, pp. 153-155; 76 Am.Jur.2d, Trial (1975) § 1105, p. 87.)

■ This court agrees with Slocum's contention that misconduct on the part of a spectator constitutes ground for a mistrial if the misconduct is of such character as to prejudice the defendant or influence the verdict. The trial court, however, has a large measure of discretion in determining whether the conduct of a spectator is of such nature as to produce prejudice. A motion for a mistrial may properly be refused where the court is satisfied that no injustice has resulted or will result from the events of which the complaint ensues. (*People* v. *Ward,* 266 Cal.App.2d 241, 249 [72 Cal.Rptr. 46]; *People* v. *Ray,* 252 Cal.App.2d 932, 962-963 [61 Cal.Rptr. 1].) Likewise, a new trial will not be granted simply because remarks were made during the trial to jurors, or within range of their hearing, by strangers to the litigation, where neither the successful party nor the jurors were at fault, unless such remarks probably influenced the verdict. (*People* v. *Kross,* 112 Cal.App.2d 602, 611 [247 P.2d 44].)

In *People* v. *Pyle,* 44 Cal.App. 130, 133 [185 P. 1019], defendant filed two affidavits alleging that one Doyle had informed defendant's attorney, outside the courtroom, and in the presence of several of the jurors, that he, Doyle, would "fix" the defendant because the defendant had unfairly deprived him of some money; although the appellate court thought such action reprehensible, it held that it was not an abuse of discretion to deny defendant's motion for a new trial in the absence of a showing that such alleged statements influenced the verdict of the jury.

In *People* v. *Currie,* 3 Cal.App.2d 31, 33 [39 P.2d 215], on an occasion when jurors were leaving the courtroom following an adjournment, at least two of them were accosted by a female prosecution witness who had testified that she purchased stock in the same company in which it was alleged that defendant had made false representations; she pleaded with the jurors to rectify the situation, informing them that she was a widow and had lost her money; apparently, the trial judge was advised of the incident prior to submission of the case to the jury although counsel for the defense was not so advised until after the verdict had been returned and the jury discharged; defendant complained that the court erred in not admonishing the jury to disregard such remarks, and that the making of such remarks, plus the failure to admonish the jurors, entitled him to a new trial; the reviewing court held that while the judge should have told the jurors to disregard such statements, it could not say that the error, if any, was prejudicial or the refusal to grant a new trial was an abuse of discretion.

■ The trial judge went to great lengths to insure Slocum a fair trial. Every officer of the court and attaché was precluded from making

any extrajudicial comments about the case. When the judge was informed of each unfortunate incident, he held an extraordinary session for the purpose of ascertaining the potential impact of the incident on the jury and whether it would influence their decisional process. A careful review of the evidence presented during the hearings demonstrates the soundness of the ruling denying a mistrial.

In the first place, Slocum waived his right to complain that jurors Humphrey and Di Leo should have been excused. He agreed they could remain on the jury. In the second place, while there was no direct evidence that Slocum was directly responsible for the Denton-Lacy incidents, there was sound, solid evidence that Slocum himself deliberately concocted a variety of schemes in a blatant effort to gain a mistrial. Unfortunately for him, he engaged Nancy in his plots to obstruct justice.

Slocum suggested to Nancy that when she was called to the stand that she spontaneously state that she had been employed by him during the trial for the murder of his daughter; he told her his goal was to obtain a mistrial; if successful, he would then attempt to get a change of venue; he felt that no other county would take the case because of the length and expense of the trial that would follow.

While living with Slocum in Riverside during the first stages of the trial (October 1973), defendant gave her an envelope and told her to deliver it to a man who would be in a car at a certain location; she gave the envelope to a male Negro driving a dark sedan; the man asked her, "Are you Nancy?"; she replied in the affirmative and handed him the envelope; soon thereafter Nancy was driving the defendant home after court; defendant was very upset; he said the contents of the envelope had been money in payment for a disturbance which would force the court to declare a mistrial; the contemner was to get $3,600 for creating the disturbance if not incarcerated and $5,000 if jailed; however, he had not appeared to create the disturbance.

In a later conversation, Slocum told Nancy he had induced another party to come to the courtroom and create a disturbance; however, the disturbance occurred while the courtroom lights were out and the effect had been entirely unsatisfactory.

On another occasion, Slocum accompanied Nancy to a phone booth in back of a shopping center; he had her telephone local newspapers and report there had been courtroom disturbances during his trial which should warrant a mistrial.

Not satisfied with the local coverage, Slocum drove Nancy to Anaheim after midnight and had her telephone the Los Angeles Times for the purpose of anonymously reporting the courtroom mishaps.

In the final incident where he attempted to manufacture grounds for a mistrial, Slocum gave Nancy a jury panel list with the names of those serving on his jury checked off; he told her to look up their telephone numbers so they could be contacted anonymously; the jurors were to be told that he had been charged with the murder of his daughter; and he said his sole purpose was to secure a mistrial.

In short, there was concrete evidence that defendant himself committed several overt acts in a bold, calculated effort to gain a mistrial. It is indeed ironic that he should now complain of a situation he deliberately sought to create.

### CHARACTER EVIDENCE

Defendant complains that two prior acts of misconduct were improperly admitted into evidence for the sole purpose of proving bad character.

Clara Catalan—an office employee of the defendant—testified that he threatened to kill her shortly before he was indicted. Her precise words were as follows: "He said—well, he accused me of reporting him to the District Attorney and trying to pin something on him and that when this mess was over he was going to shoot my ass."

The evidence relating to the other prior act originated when Slocum was asked by the prosecutor on cross-examination whether he had been placed on "comprehensive review" by Blue Shield and he replied that he had no knowledge of such action. The prosecutor rephrased the question and asked him whether he had been placed on review for "overbilling" in 1968. Slocum replied in the negative. Later, on rebuttal, the prosecutor called a Blue Shield auditor. Anticipating the auditor's probable testimony, defense counsel asked that the admissibility of, and foundation for, the anticipated testimony be determined outside the presence of the jury. Defense objection was made on the ground of irrelevancy, hearsay and assuming facts not in evidence. The trial court directed the district attorney to make an offer of proof. The offer was that the defendant had been placed on review in 1968 and the testimony was being offered for impeachment purposes. The court overruled the

objection. The prosecutor asked the following question in the presence of the jury: "Q. . . . did you become aware of an investigation of the defendant . . . in the year of 1967 and '68?" An objection was again interposed. The court then held an *in camera* hearing and sustained the objection.

Defendant argues that the damage had already been done by the question, implanting in the jurors' minds the probability that Slocum had been warned once before about overbilling but had ignored the warning and continued to defraud the government.

■ Slocum first complains that his threat to harm Clara Catalan was improperly admitted. We disagree. A threat made by a defendant against a prospective prosecution witness whom he expects to testify against him, with the apparent intention of intimidating the witness, is proper evidence; efforts of an accused to suppress testimony against himself indicate a consciousness of guilt. (*People* v. *Cruz,* 260 Cal.App.2d 55, 60 [66 Cal.Rptr. 772].) Defendant would have us distinguish *Cruz* on the ground that no indictment had yet issued in his case when the threat was made. This we fail to do inasmuch as he was aware of an ongoing investigation designed to probe his dealings with Medi-Cal.

In view of the foregoing standard, we cannot perceive any basis for defendant's complaint. The thrust of the threat is obvious and to translate its meaning would be redundant. It is a threat made against a prospective witness and evinces a consciousness of guilt. No other inference is possible.

■ Turning to the incident involving the auditor, Slocum raises two separate but interrelated complaints. Initially, he contends the prosecutor committed misconduct by asking the aforementioned allegedly improper question on rebuttal. No such misconduct occurred. Defendant next claims that the trial court should have conducted a hearing as to the admissibility of the rebuttal witness' testimony outside the presence of the jury before permitting the district attorney to examine the witness. We disagree.

Defendant's entire claim is based upon the assertion that he had no *knowledge* of being placed on comprehensive review by Blue Shield in 1968. While he did testify to this effect, he also testified that he had *not* been placed on review. Thus, the testimony which the prosecutor sought to elicit on rebuttal from the auditor for the purpose of impeaching

defendant did not constitute misconduct. Prosecutorial misconduct involves a dishonest act or attempt to persuade the court or jury through the use of deceptive or reprehensible methods. (*People* v. *Chojnacky,* 8 Cal.3d 759, 766 [106 Cal.Rptr. 106, 505 P.2d 530]; *People* v. *Beivelman,* 70 Cal.2d 60, 75 [73 Cal.Rptr. 521, 447 P.2d 913]; *People* v. *Asta,* 251 Cal.App.2d 64, 86 [59 Cal.Rptr. 206]; 18 Cal.Jur.3d, Criminal Law (1975) § 836, p. 528.)

Furthermore, defendant failed to make a motion to strike the question or to request the court to admonish the jury to disregard any inference contained in it. Having failed to take the appropriate steps to eliminate any adverse effect the question may have had, he cannot complain for the first time on appeal that the propounding of the question constituted prejudicial misconduct. (*People* v. *Kramer,* 259 Cal.App.2d 452, 469 [66 Cal.Rptr. 638]; *People* v. *Campbell,* 232 Cal.App.2d 712, 715 [43 Cal.Rptr. 71].)

Defendant also attacks the failure of the trial judge to hold an *in camera* hearing with regard to the admissibility of the proffered evidence. He asserts that the procedures outlined in section 402 of the Evidence Code should have been followed.

Initially, it should be noted that no impeaching testimony was ever elicited from the rebuttal witness. After the question was asked, the trial judge granted defendant's renewed request for an *in camera* hearing. This was proper. In situations not involving confessions or admissions going directly to the crime charged, it is within the trial judge's discretion as to whether he will initially hear evidence outside the presence of the jury as to a preliminary fact that may bear upon the admissibility of proffered evidence. (*People* v. *Scherr,* 272 Cal.App.2d 165, 169 [77 Cal.Rptr. 35].)

## GRAND THEFT CHARGE

Defendant contends that each taking charged in the grand theft count should have been charged as a separate misdemeanor offense as a matter of law in that each fraudulent claim was less than $200. (Count I charged Slocum with wrongfully taking over $200 in government funds between Sept. 1, 1971 and July 31, 1972, a felony.)

A series of wrongful takings may, depending upon the facts, constitute multiple offenses rather than one single charge. (*People* v. *Stanford,* 16

Cal.2d 247, 251 [105 P.2d 969].) For example, where an accused obtained five checks at separate times on the basis of a *single* fraudulent misrepresentation, he was properly charged with five counts of grand theft rather than only one such count, the theory being that the receipt and appropriation of monies on five separate dates constituted five separate acts. (*People* v. *Caldwell,* 55 Cal.App.2d 238, 251 [130 P.2d 495].) But the question of whether a series of wrongful acts constitutes a single offense or multiple offenses is dependent upon the facts of each case; a defendant may be convicted upon separate counts charging grand theft from the same person or entity if the evidence shows that the offenses are separate and distinct and were not committed pursuant to a general plan or intention. (*People* v. *Bailey,* 55 Cal.2d 514, 519 [11 Cal.Rptr. 543, 360 P.2d 39].) Thus, if the defendant has no general overall plan or intent, each offense is viewed as being distinct; if he has a general intent or overall plan, there is only one offense, and the values will be aggregated to make a single crime of grand theft. (1 Witkin, Cal. Crimes (1963) § 374, p. 348.) The *Bailey* doctrine was developed for the crime of theft to allow, where there is a general plan, the accumulation of receipts from takings, each less than $200, so that the thief may be prosecuted for grand theft as opposed to several petty thefts. (*People* v. *Neder,* 16 Cal.App.3d 846, 852 [94 Cal.Rptr. 364].)

The jury herein was instructed in accordance with the *Bailey* rule. The instruction was given at the request of both the prosecution and the defense. The only question remaining is whether the trial court properly instructed the jury on this theory.

■ The court must instruct the jury on any material evidence deserving of consideration whatever. The fact that the evidence may not have been of a character to inspire belief does not authorize refusal of any instruction based thereon. The weight to be accorded certain evidence is a question within the exclusive province of the jury. (*People* v. *Morse,* 70 Cal.2d 711, 732 [76 Cal.Rptr. 391, 452 P.2d 607].) ■ Inasmuch as the issue was a factual one and inasmuch as both sides requested the instruction and there was substantial evidence on the issue deserving of consideration by the jury, the trial court herein under *Morse* had no choice but to render the *Bailey* instruction.

Slocum primarily relies upon cases which are inapposite: *People* v. *Caldwell, supra,* 55 Cal.App.2d 238, and *People* v. *Ellison,* 26 Cal.App.2d 496 [79 P.2d 732]. These cases were distinguished in *People* v. *Bailey, supra,* 55 Cal.2d at page 519, on the ground that there was no general

plan or intent shown, but rather, involved separate and distinct transactions.

### FORM OF QUESTIONS

Defendant contends that the trial court erred in allowing the district attorney to ask three questions prefaced by the phrase "to your knowledge" in that the form of the questions was ambiguous.

This contention is not well taken and thus must fail. Although ambiguous questions are objectionable (Evid. Code, § 765), the district attorney was merely reiterating the basic principle that questions may not be answered absent personal knowledge. (Evid. Code, § 702.)

### EXPERT TESTIMONY

■ Defendant contends that the testimony of another Orange County physician, Dr. Pereyra, regarding custom and practice in the profession lacked adequate foundation and was therefore improperly admitted into evidence. We disagree.

Defendant claimed that he had no intent to defraud and was simply following the custom and practice of his profession in Orange County in using the Medi-Cal stamps of one family member for another when he submitted false bills to Medi-Cal, asserting that services had been rendered to one family member when in reality they had been performed for another. Dr. Pereyra's testimony contradicted Slocum's testimony.

Dr. Pereyra had been in practice since 1953 and the major portion of his practice involved Medi-Cal patients. He had not encountered or discussed any such custom or practice. It is for this reason that defendant asserts an inadequate foundation was laid for receipt of Pereyra's testimony. Defendant would apparently require Dr. Pereyra to have discussed a nonexistent custom with his fellow physicians. For obvious reasons, the argument lacks integrity.

### UNSIGNED CLAIM FORMS

■ Defendant urges that claim forms not prepared or signed by him were improperly admitted into evidence. He argues that such evidence should have been excluded as being irrelevant. At best, his objection goes to the weight of the evidence and not to admissibility.

Section 350 of the Evidence Code provides: "No evidence is admissible except relevant evidence." " 'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

Early in the trial, Dr. Lantz testified as to the recognized practice and custom in the medical industry relating to the completion and signing of Medi-Cal forms: he indicated that 60 percent of the time doctors do not complete Medi-Cal forms and 50 percent of the time do not sign the forms but authorize someone else to do it in their behalf.

■ While there is no universal test of relevancy, the general rule in criminal cases might be stated as whether or not the evidence tends logically, naturally, and by reasonable inference to establish any fact material for the prosecution or to overcome any material matter sought to be proved by the defense. (*People* v. *Warner,* 270 Cal.App.2d 900, 907 [76 Cal.Rptr. 160].) Evidence is relevant when no matter how weak it may be, it tends to prove the issue before the jury. (*People* v. *Hess,* 104 Cal.App.2d 642, 676 [234 P.2d 65].) ■ The weight of such evidence is for the jury. (*People* v. *Hess, supra,* 104 Cal.App.2d at p. 676.) Consequently, the court properly admitted the forms.

## PHOTOGRAPHS

■ Defendant contends that the trial court improperly admitted photographs of certain items of medical equipment in that the photos were not substantially identical to equipment being used by him during the time period encompassed by the indictment. We disagree.

Defendant places heavy reliance on *People* v. *Vaiza,* 244 Cal.App.2d 121 [52 Cal.Rptr. 733], and *Anello* v. *Southern Pacific Co.,* 174 Cal.App.2d 317 [344 P.2d 843], which stand for the proposition that when demonstrative evidence has a strong tendency to mislead the jury as to an essential element of the case, it should not be admitted. These cases are patently inapposite to the present situation.

The standard to be applied by the trial court in ruling upon the admissibility of photographs is whether they fairly depict that which they purport to portray. (*Greeneich* v. *Southern Pac. Co.,* 189 Cal.App.2d 100, 108 [11 Cal.Rptr. 235]; *Anello* v. *Southern Pacific Co., supra,* 174 Cal.App.2d 317, 323; *Barone* v. *Jones,* 77 Cal.App.2d 656, 661 [176 P.2d

392, 177 P.2d 30].) The trial judge felt that the testimony of witnesses would be aided by reference to the photographs. Throughout the long trial, the questioning involved the nature of the services rendered by Slocum and the equipment he used. The district attorney did not represent that the photos represented the actual equipment used by Slocum. He stated the photos depicted *similar* equipment—not *identical* equipment.

The standards for introduction of physical evidence such as the nasal pack tray are substantially the same as those involving the photos. The object is relevant if it fairly illustrates the testimony which it buttresses. (Jefferson, Cal. Evidence Benchbook (1972) § 20.4, p. 238.)

## INSTRUCTIONS

██ Defendant contends that the trial court erred in refusing to give the following instruction: "Evidence has been introduced that Dr. Slocum believed it was proper to use Medi-Cal stamps belonging to one member of a family for treatment rendered to another member of that family. If Dr. Slocum believed such use was proper, his use of such stamps in such manner would not be a violation of section 72 of the Penal Code and would not constitute theft by false pretenses."

Slocum argues that the following language in *People* v. *Sears,* 2 Cal.3d 180 [84 Cal.Rptr. 711, 465 P.2d 847], mandates the giving of his proposed instruction: "[A] defendant, upon proper request therefor, has a right to an instruction that directs attention to evidence from a consideration of which a reasonable doubt of his guilt could be engendered." (*Id.,* p. 190.)

However, the jury was properly and exhaustively instructed on the specific intent required for a finding of guilt. (CALJIC No. 2.02 [sufficiency of circumstantial evidence to prove specific intent]; CALJIC No. 2.09 [evidence showing defendant's state of mind]; CALJIC No. 3.31 [concurrence of act and specific intent]; CALJIC No. 3.34 [how intent is shown]; CALJIC No. 4.35 [ignorance or mistake of fact]; CALJIC No. 14.10 [definition of theft by false pretense].) Slocum's proffered instruction was virtually identical to CALJIC No. 4.35 which was given.

██ Defendant asserts that the trial court erred in refusing the following instruction: "Unless you find that Dr. Slocum knowingly and designedly submitted Medi-Cal claim forms on which he was paid a sum in excess of $200.00, for claimed services which he did not render, with

the specific intent to defraud Medi-Cal and that said claim forms were submitted pursuant to one scheme or plan to defraud, you cannot find Dr. Slocum guilty of Grand Theft."

The jury was correctly instructed as to the requisite intent. Furthermore, the trial court also gave CALJIC No. 14.31 (grand theft and petty theft—theft in installments). That instruction lucidly covers the issue. A court may refuse to give a defendant's proposed instructions on an issue where that issue is covered by other instructions. (*People* v. *Arguello,* 61 Cal.2d 210, 213 [37 Cal.Rptr. 601, 390 P.2d 377]; *People* v. *Quinlan,* 8 Cal.App.3d 1063, 1068 [88 Cal.Rptr. 125]; *People* v. *Galvan,* 208 Cal.App.2d 443, 449 [25 Cal.Rptr. 128].)

■ Defendant next complains that the trial court erred in refusing the following: "Evidence has been introduced: (1) That the description used by the district attorney in describing the procedures used in taking an I.V.P. x-ray referred to a procedure that is seldom used. (2) That Nasal Pack Trays such as that which was admitted into evidence as People's Exhibit 28 are not used in doctor's offices. (3) That the procedure used in taking a specimen for a throat culture was not properly described by the district attorney. [¶] You may consider this evidence in determining what weight to give to the testimony of witnesses that they did not have the treatments referred to."

Argumentative instructions are improper. "It appears to be a common practice to select certain material facts, or those which are deemed to be material, and endeavor to force the court to indicate an opinion favorable to the defendant as to the effect of such facts, by incorporating them into instructions containing a correct principle of law." (*People* v. *McNamara,* 94 Cal. 509, 513 [29 P. 953]; see also *People* v. *Hill,* 76 Cal.App.2d 330, 342 [173 P.2d 26].) The proposed instruction fits the foregoing description.

The judgment of conviction is affirmed.

Gardner, P. J., and Tamura, J., concurred.

A petition for a rehearing was denied November 25, 1975, and appellant's petition for a hearing by the Supreme Court was denied January 21, 1976.